LYNCH ET AL. *v.* HOUSEHOLD FINANCE CORP.
ET AL.

No. 70–5058.   Argued December 7, 1971—Decided March 23, 1972

STEWART, J., delivered the opinion of the Court, in which DOUG-
LAS, BRENNAN, and MARSHALL, JJ., joined. WHITE, J., filed a
dissenting opinion, in which BURGER, C. J., and BLACKMUN, J.,
joined, *post*, p. 556. POWELL and REHNQUIST, JJ., took no part in
the consideration or decision of the case.

*David M. Lesser* argued the cause for appellants.
With him on the briefs was *William H. Clendenen, Jr.*

*Richard G. Bell* argued the cause for appellees. With
him on the brief for appellees Household Finance Corp.
et al. were *Charles A. Pulaski, Jr.,* and *David W. Gold-
man. Robert K. Killian,* Attorney General of Connect-
icut, and *Raymond J. Cannon* and *Robert L. Hirtle,
Jr.,* Assistant Attorneys General, filed a brief for Barrett,
Deputy Sheriff.

MR. JUSTICE STEWART delivered the opinion of the
Court.

In 1968, the appellant, Mrs. Dorothy Lynch, a resi-
dent of New Haven, Connecticut, directed her em-
ployer to deposit $10 of her $69 weekly wage in a credit
union savings account. In 1969, appellee Household
Finance Corp. sued Mrs. Lynch for $525 in a state
court, alleging nonpayment of a promissory note.
Before she was served with process, the appellee cor-
poration garnished her savings account under the pro-
visions of Connecticut law that authorize summary
pre-judicial garnishment at the behest of attorneys for
alleged creditors.[1]

The appellant then brought this class action in a
federal district court against Connecticut sheriffs who
levy on bank accounts and against creditors who in-

---

[1] The garnishment was levied pursuant to Conn. Gen. Stat. Rev.
§ 52–329. For a further description of Connecticut's statutory gar-
nishment scheme, see Part II of this opinion, *infra*.

voke the garnishment statute.[2] Mrs. Lynch alleged that she had no prior notice of the garnishment and no opportunity to be heard. She claimed that the state statutes were invalid under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and sought declaratory and injunctive relief pursuant to 42 U. S. C. § 1983 [3] and its jurisdictional counterpart, 28 U. S. C. § 1343 (3).[4] A district court of three judges was convened to hear the claim under 28 U. S. C. §§ 2281 and 2284.

---

[2] The second named appellant, Norma Toro, had her checking account garnished by her former landlord, one Eugene Composano. Subsequently Composano released the garnishment. An issue of mootnesss—which was not resolved by the District Court—is thus presented. We do not, however, reach this issue. Appellant Lynch had a savings account garnished, appellant Toro a checking account. The considerations applicable to one type of account seem identical to those applicable to the other. In this opinion, therefore, we shall only refer to the case of appellant Lynch.

An issue is also raised as to the propriety of the classes purported to be represented by the appellants and appellees. In view of our disposition of the case, we leave this issue for consideration by the District Court upon remand.

[3] The statute provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[4] The statute states in relevant part:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

. . .

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . . ."

The District Court did not reach the merits of the case. It dismissed the complaint without an evidentiary hearing on the grounds that it lacked jurisdiction under § 1343 (3) and that relief was barred by the statute prohibiting injunctions against state court proceedings, 28 U. S. C. § 2283. 318 F. Supp. 1111. We noted probable jurisdiction, pursuant to 28 U. S. C. § 1253,[5] to consider the jurisdictional issues presented. 401 U. S. 935.

---

[5] The appellees argue that we have no jurisdiction to consider this case on direct appeal from the three-judge District Court, 28 U. S. C. § 1253, because the court did not reach the merits of the appellant's claim for an injunction but dismissed for lack of subject matter jurisdiction.

But whether a direct appeal will lie depends on "whether the three-judge [court was] properly convened." *Moody* v. *Flowers,* 387 U. S. 97, 99. This action challenges the constitutionality of a state statute and seeks to enjoin its enforcement. The questions it raises are substantial. It, therefore, meets the requirements for convening a three-judge court. 28 U. S. C. § 2281; *Idlewild Bon Voyage Liquor Corp.* v. *Epstein,* 370 U. S. 713, 715. This case may, therefore, be distinguished from *Perez* v. *Ledesma,* 401 U. S. 82, upon which the appellees rely. In that case, we had no power to consider the merits of an appeal because the ordinance in question was neither a state statute nor of statewide application. *Perez, supra,* at 89 (concurring opinion). When a state statute is challenged and injunctive relief sought, we have granted direct review pursuant to § 1253 although three-judge courts dismissed for lack of subject-matter jurisdiction, *Baker* v. *Carr,* 369 U. S. 186, *Abernathy* v. *Carpenter,* 373 U. S. 241, *Doud* v. *Hodge,* 350 U. S. 485, *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73, or because relief was thought to be barred by 28 U. S. C. § 2283, *Cameron* v. *Johnson,* 390 U. S. 611.

The appellees also note that § 1253 permits appeals to this Court only from orders "granting or denying . . . an interlocutory or permanent injunction . . . ." They argue that since the three-judge court never considered whether an injunction should be granted an appeal should lie to the Court of Appeals. The three-judge court, however, entered a judgment "denying all relief sought by plaintiffs." We therefore have jurisdiction to consider the claims presented.

We hold, for the reasons that follow, that neither § 1343 (3) nor § 2283 warranted dismissal of the appellant's complaint. Accordingly, we remand the case to the District Court for consideration of the remaining issues in this litigation.

I

In dismissing the appellant's complaint, the District Court held that § 1343 (3) applies only if "personal" rights, as opposed to "property" rights, are allegedly impaired. The court relied on the decision of the Court of Appeals for the Second Circuit in *Eisen* v. *Eastman*, 421 F. 2d 560, 563, which rested, in turn, on Mr. Justice Stone's well-known opinion a generation ago in *Hague* v. *CIO*, 307 U. S. 496, 531. See also, *e. g.*, *Weddle* v. *Director*, 436 F. 2d 342; *Bussie* v. *Long*, 383 F. 2d 766; *Howard* v. *Higgins*, 379 F. 2d 227.

This Court has never adopted the distinction between personal liberties and proprietary rights as a guide to the contours of § 1343 (3) jurisdiction.[6] Today we expressly reject that distinction.

[6] The appellees cite three cases decided by this Court before *Hague* v. *CIO*, 307 U. S. 496, that, they say, support the limitation of § 1343 (3) jurisdiction to claims of deprivation of personal liberties. *Carter* v. *Greenhow*, 114 U. S. 317; *Pleasants* v. *Greenhow*, 114 U. S. 323; *Holt* v. *Indiana Mfg. Co.*, 176 U. S. 68. The appellees also rely on two recent affirmances, without opinion, of decisions by three-judge district courts dismissing § 1343 (3) suits on the ground that the rights allegedly infringed were proprietary. *Hornbeak* v. *Hamm*, 393 U. S. 9, aff'g 283 F. Supp. 549 (MD Ala. 1968); *Abernathy* v. *Carpenter*, 373 U. S. 241, aff'g 208 F. Supp. 793 (WD Mo. 1962). All of these cases involved constitutional challenges to the collection of state taxes. Congress has treated judicial interference with the enforcement of state tax laws as a subject governed by unique considerations and has restricted federal jurisdiction accordingly:

"The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a

## A

Neither the words of § 1343 (3) nor the legislative history of that provision distinguishes between personal and property rights. In fact, the Congress that enacted the predecessor of §§ 1983 and 1343 (3) seems clearly to have intended to provide a federal judicial forum for the redress of wrongful deprivations of property by persons acting under color of state law.

This Court has traced the origin of § 1983 and its jurisdictional counterpart to the Civil Rights Act of 1866, 14 Stat. 27. *Adickes* v. *Kress & Co.,* 398 U. S. 144, 162–163; *Monroe* v. *Pape,* 365 U. S. 167, 171, 183–185.[7] That Act guaranteed "broad and sweeping . . . pro-

plain, speedy and efficient remedy may be had in the courts of such State." 28 U. S. C. § 1341.

We have repeatedly barred anticipatory federal adjudication of the validity of state tax laws. *Dows* v. *City of Chicago,* 11 Wall. 108; *Matthews* v. *Rodgers,* 284 U. S. 521; *Great Lakes Dredge & Dock Co.* v. *Huffman,* 319 U. S. 293; see also *Perez* v. *Ledesma,* 401 U. S., at 126–127, n. 17 (opinion of BRENNAN, J.). The decisions cited by appellees may, therefore, be seen as consistent with congressional restriction of federal jurisdiction in this special class of cases, and with longstanding judicial policy.

[7] Section 2 of the 1866 Act was the model for § 1 of the Civil Rights Act of 1871, 17 Stat. 13. See n. 9, *infra.* Sections 1983 and 1343 (3) are direct descendants of § 1 of the Act of 1871. In 1874, Congress consolidated the various federal statutes at large under separate titles in the Revised Statutes in order to codify existing law. In the process, the substantive provision of § 1 of the 1871 Act became separated from its jurisdictional counterpart. Rev. Stat. § 1979. Although the original substantive provision had protected rights, privileges, or immunities secured by the Constitution, the provision in the Revised Statutes was enlarged to provide protection for rights, privileges, or immunities secured by federal law as well.

Originally, suits under § 1 of the 1871 Act could be brought in either circuit or district court. After codification in 1874, the juris-

tection" to basic civil rights. *Sullivan* v. *Little Hunting Park,* 396 U. S. 229, 237. Acquisition, enjoyment, and alienation of property were among those rights. *Jones* v. *Mayer Co.,* 392 U. S. 409, 432.[8]

The Fourteenth Amendment vindicated for all persons the rights established by the Act of 1866. *Monroe, supra,* at 171; *Hague, supra,* at 509–510. "It cannot be doubted that among the civil rights intended to be protected from discriminatory state action by the Fourteenth Amendment are the rights to acquire, enjoy, own and dispose of property. Equality in the enjoyment of property rights was regarded by the framers of that Amendment as an essential pre-condition to the realization of other basic civil rights and liberties which the Amendment was intended to guarantee." *Shelley* v. *Kraemer,* 334 U. S. 1, 10. See also, *Buchanan* v. *Warley,* 245 U. S. 60, 74–79; H. Flack, The Adoption of the Fourteenth Amendment 75–78, 81, 90–97 (1908); J. tenBroek, The Antislavery Origins of the Fourteenth Amendment (1951).

---

dictional grant to the district courts was identical in scope with the expanded substantive provision, Rev. Stat. § 563 (12). Circuit court jurisdiction was limited to claimed deprivations of rights, privileges, or immunities secured by the Constitution or by any Act of Congress "providing for equal rights." Rev. Stat. § 629 (16). In 1911, when Congress abolished the circuit courts' original jurisdiction and merged the two jurisdictional sections into what is now § 1343 (3), the "equal rights" limitation was retained in the revised jurisdictional grant. Act of Mar. 3, 1911, 36 Stat. 1087. Despite the different wording of the substantive and jurisdictional provisions, when the § 1983 claim alleges constitutional violations, § 1343 (3) provides jurisdiction and both sections are construed identically. *Douglas* v. *City of Jeannette,* 319 U. S. 157, 161.

[8] See generally Report of C. Shurz, S. Exec. Doc. No. 2, 39th Cong., 1st Sess. (1865); Cong. Globe, 39th Cong., 1st Sess., 3034–3035 and App. 219 (1866); J. tenBroek, The Antislavery Origins of the Fourteenth Amendment (1951); Frank & Munro, The Original Understanding of "Equal Protection of the Laws," 50 Col. L. Rev. 131, 144–145 (1950).

The broad concept of civil rights embodied in the 1866 Act and in the Fourteenth Amendment is unmistakably evident in the legislative history of § 1 of the Civil Rights Act of 1871, 17 Stat. 13, the direct lineal ancestor of §§ 1983 and 1343 (3). Not only was § 1 of the 1871 Act derived from § 2 of the 1866 Act,[9] but the 1871 Act was passed for the express purpose of "enforc[ing] the Provisions of the Fourteenth Amendment." 17 Stat. 13. And the rights that Congress sought to protect in the Act of 1871 were described by the chairman of the House Select Committee that drafted the legislation as "the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety." Cong. Globe, 42d Cong., 1st Sess., App. 69 (1871) (Rep. Shellabarger, quoting from *Corfield* v. *Coryell,* 6 F. Cas. 546, 551–552 (No. 3230) (CCED Pa.)).

---

[9] Section 2 of the 1866 Civil Rights Act, 14 Stat. 27, currently codified in slightly different form as 18 U. S. C. § 242, read in pertinent part:

"[A]ny person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State . . . to the deprivation of any right *secured or protected* by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude . . . shall be deemed guilty of a misdemeanor . . . ." (Emphasis supplied.)

Section 2 provided criminal penalties for any violation of § 1 of the 1866 Act. *Screws* v. *United States,* 325 U. S. 91, 98–100. The latter section enumerated the rights the Act protected, including, *inter alia,* the right "to make and enforce contracts, to sue . . . to inherit, purchase, lease, sell, hold, and convey real and personal property. . . ."

Representative Shellabarger, chairman of the House Select Committee which drafted the Civil Rights Act of 1871, stated that

"The model for [§ 1 of the 1871 Act] will be found in the second section of the act of April 9, 1866, known as the 'civil rights act.' That section provides a criminal proceeding in identically the same case as this one provides a civil remedy . . . ." Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871).

That the protection of property as well as personal rights was intended is also confirmed by President Grant's message to Congress urging passage of the legislation,[10] and by the remarks of many members of Congress during the legislative debates.[11]

## B

In 1875, Congress granted the federal courts jurisdiction of "all suits of a civil nature at common law or in equity . . . arising under the Constitution or laws of the United States." 18 Stat. 470. Unlike § 1343 (3), this general federal-question provision, the forerunner of 28 U. S. C. § 1331, required that a minimum amount in controversy be alleged and proved.[12] Mr. Justice Stone's opinion in *Hague, supra,* as well as the federal court decisions that followed it, *e. g., Eisen* v. *Eastman,* 421 F. 2d 560, reflect the view that there is an apparent

---

[10] The President, in a message dated March 23, 1871, stated:

"A condition of affairs now exists in some States of the Union rendering life and property insecure . . . . I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States." Cong. Globe, 42d Cong., 1st Sess., 244.

[11] See, *e. g.,* Cong. Globe, 42d Cong., 1st Sess., 332–334 (Rep. Hoar); 369–370 (Rep. Monroe); 375–376 (Rep. Lowe); 429 (Rep. Beatty); 448 (Rep. Butler); 459–461 (Rep. Coburn); 475–476 (Rep. Dawes); 501 (Sen. Frelinghuysen); 568 (Sen. Edmunds); 577 (Sen. Carpenter); 607 (Sen. Pool); 650–651 (Sen. Sumner); 653 (Sen. Osborn); 666 (Sen. Spencer).

See also S. Rep. No. 1, 42d Cong., 1st Sess. (1871). Several months before the passage of the Civil Rights Act of 1871, a Senate Committee was formed to investigate conditions in the Southern States. One purpose of the investigation was to "ascertain . . . whether persons and property are secure. . . ." *Id.,* at II.

[12] The jurisdictional amount was increased from $500 to $2,000 by the Act of Mar. 3, 1887, 24 Stat. 552; to $3,000 by the Act of Mar. 3, 1911, 36 Stat. 1091; and to $10,000 by the Act of July 25, 1958, 72 Stat. 415.

conflict between §§ 1343 (3) and 1331,[13] *i. e.*, that a broad reading of § 1343 (3) to include all rights secured by the Constitution would render § 1331, and its amount-in-controversy requirement, superfluous. These opinions sought to harmonize the two jurisdictional provisions by construing § 1343 (3) as conferring federal jurisdiction of suits brought under § 1983 only when the right asserted is personal, not proprietary.

The initial failure of this reasoning is that the supposed conflict between §§ 1343 (3) and 1331 simply does not exist. Section 1343 (3) applies only to alleged infringements of rights under "color of . . . State law," whereas § 1331 contains no such requirement. Thus, for example, in suits against federal officials for alleged deprivations of constitutional rights, it is necessary to satisfy the amount-in-controversy requirement for federal jurisdiction. See *Oestereich* v. *Selective Service Board,* 393 U. S. 233; *Bivens* v. *Six Unknown Named Agents,* 403 U. S. 388.

But the more fundamental point to be made is that any such contraction of § 1343 (3) jurisdiction is not

---

[13] The plaintiffs in *Hague* brought suit in a federal district court to enjoin enforcement of city ordinances prohibiting the distribution of printed matter and the holding of public meetings without a permit. They alleged that the ordinances violated the union members' right of free speech and assembly. Both the District Court and the Court of Appeals found jurisdiction under §§ 1331 and 1343 (3). This Court reversed as to jurisdiction under § 1331, since the plaintiffs had failed to establish the requisite amount in controversy. Although no opinion commanded a majority, jurisdiction under § 1343 (3) was upheld. Mr. Justice Roberts, writing the lead opinion, expressed the view that the reference in § 1343 to "any right, privilege or immunity secured by the Constitution" should be interpreted to cover only alleged violations of the Privileges and Immunities Clause of the Fourteenth Amendment. In *Monroe* v. *Pape,* 365 U. S. 167, 170–171, we rejected such a narrow reading of similar language in § 1983.

supported by the legislative history of § 1331. The 1875 Act giving the federal courts power to hear suits arising under Art. III, § 2, of the Constitution was, like the Act of 1871, an expansion of national authority over matters that, before the Civil War, had been left to the States. F. Frankfurter & J. Landis, The Business of the Supreme Court 65 (1928); *Zwickler* v. *Koota,* 389 U. S. 241, 245–248; Chadbourn & Levin, Original Jurisdiction of Federal Questions, 90 U. Pa. L. Rev. 639, 645 (1942). The Act, therefore, is "clearly . . . part of, rather than an exception to, the trend of legislation which preceded it." Chadbourn & Levin, *supra,* at 645; *Zwickler, supra.* There was very little discussion of the measure before its enactment, in contrast to the extensive congressional debate that attended the passage of the Act of 1871.[14] And there is, as a result, no indication whatsoever that Congress, in a rather hastily passed measure, intended to narrow the scope of a provision passed four years earlier as part of major civil rights legislation.[15]

---

[14] "[A] study of the history of the bill as revealed by the Congressional Record yields no reason for its enactment at that time; and may even be said to raise a strong presumption that it was 'sneak' legislation. It was originally introduced in the House of Representatives in the form of a bill to amend the removal statute." Chadbourn & Levin, Original Jurisdiction of Federal Questions, 90 U. Pa. L. Rev. 639, 642–643 (1942). Nonetheless, the passage of the Act, despite the lack of debate, has been regarded as the "culmination of a movement . . . to strengthen the Federal Government against the states." F. Frankfurter & J. Landis, The Business of the Supreme Court 65 n. 34 (1928). See also Maury, The Late Civil War, Its Effect on Jurisdiction, and on Civil Remedies Generally, 23 Am. L. Reg. 129 (1875).

[15] As noted, Congress in 1875 also enlarged the scope of § 1983's predecessor to protect rights secured by federal law as well as rights secured by the Constitution. See n. 7, *supra.* Moreover, when Congress increased the amount-in-controversy requirement to $3,000 in 1911, 36 Stat. 1091, there was no indication that jurisdiction

The "cardinal rule . . . that repeals by implication are not favored," *Posadas* v. *National City Bank,* 296 U. S. 497, 503; *Jones* v. *Mayer Co.,* 392 U. S., at 437, thus counsels a refusal to pare down § 1343 (3) jurisdiction—and the substantive scope of § 1983—by means of the distinction between personal liberties and property rights, or in any other way. The statutory descendants of § 1 of the Civil Rights Act of 1871 must be given the meaning and sweep that their origins and their language dictate.[16]

Moreover, although the purpose of the amount-in-controversy requirement is to reduce congestion in the federal courts, S. Rep. No. 1830, 85th Cong., 2d Sess. (1958), Congress has substantially lessened its importance with respect to § 1331 by passing many statutes that confer federal-question jurisdiction without an amount-in-controversy requirement.[17] So it was that

under what is now § 1343 (3) was to be reduced. In fact, the legislation explicitly preserved the exemption of action brought under § 1343 (3)'s predecessor from the amount-in-controversy requirement.

[16] In *United States* v. *Price,* 383 U. S. 787, 797, we interpreted the phrase "rights, privileges, or immunities secured . . . by the Constitution or laws of the United States," contained in 18 U. S. C. § 242, to embrace *"all* of the Constitution and laws of the United States." The similar language in §§ 1983 and 1343 (3) was originally modeled on § 242's predecessor, § 2 of the Civil Rights Act of 1866. See n. 9, *supra.* In *Price, supra,* we said that "[w]e are not at liberty to seek ingenious analytical instruments" to avoid giving a congressional enactment the scope that its language and origins require. *Id.,* at 801.

[17] A series of particular statutes grant jurisdiction, without regard to the amount in controversy, in virtually all areas that otherwise would fall under the general federal-question statute. Such special statutes cover: admiralty, maritime, and prize cases, 28 U. S. C. § 1333; bankruptcy matters and proceedings, 28 U. S. C. § 1334; review of orders of the Interstate Commerce Commission, 28 U. S. C. § 1336; cases arising under any Act of Congress regulating commerce,

when Congress increased the jurisdictional amount from $3,000 to $10,000, Act of July 25, 1958, 72 Stat. 415, it made clear that its primary concern was to reduce the federal judiciary's workload with regard to cases arising under federal diversity jurisdiction, 28 U. S. C. § 1332, not under § 1331.[18]

A final, compelling reason for rejecting a "personal liberties" limitation upon § 1343 (3) is the virtual im-

---

28 U. S. C. § 1337; patent, copyright, and trademark cases, 28 U. S. C. § 1338; postal matters, 28 U. S. C. § 1339; internal revenue and custom duties actions, 28 U. S. C. § 1340; election disputes, 28 U. S. C. § 1344; cases in which the United States is a party, 28 U. S. C. §§ 1345, 1346, 1347, 1348, 1349, 1358, and 1361; certain tort actions by aliens, 28 U. S. C. § 1350; actions on bonds executed under federal law, 28 U. S. C. § 1352; cases involving Indian allotments, 28 U. S. C. § 1353; and injuries under federal law, 28 U. S. C. § 1357.

[18] "While this bill applies the $10,000 minimum limitation to cases involving Federal questions, its effect will be greater on diversity cases since many of the so-called Federal question cases will be exempt from its provisions." S. Rep. No. 1830, 85th Cong., 2d Sess., 6 (1958). The Senate report was echoing the finding of the Judicial Conference's Committee on Jurisdiction and Venue that raising the jurisdictional - amount would "have significant effect mainly upon diversity cases." *Id.*, at 22.

Recent studies have demonstrated that the amount-in-controversy requirement still has "relatively little impact on the volume of federal question litigation." American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 172, 489–492 (1969). See also, Warren, Address to the American Law Institute, 1960, 25 F. R. D. 213; C. Wright, Law of Federal Courts 107 (2d ed. 1970). Information from the Administrative Office of the United States Courts shows that a majority of private federal-question cases involve less than $10,000. American Law Institute, *supra*, at 491.

Although litigation involving federal civil rights is increasing, such actions constituted only 4.6% of the suits instituted in district courts during the 1970 fiscal year. Administrative Office of the United States Courts, 1970 Report, II–31.

possibility of applying it.[19] The federal courts have been particularly bedeviled by "mixed" cases in which both personal and property rights are implicated, and the line between them has been difficult to draw with any consistency or principled objectivity.[20] The case

---

[19] As noted above, we have never adopted the property rights-personal liberties test for § 1343 (3) jurisdiction. In *Eisen* v. *Eastman*, 421 F. 2d 560, the Court of Appeals for the Second Circuit said that application of the test would bar many welfare claims. *Id.*, at 566 n. 10. We have, however, continually found § 1343 (3) jurisdiction in such cases. See, *e. g., California Department of Human Resources* v. *Java*, 402 U. S. 121; *Rosado* v. *Wyman*, 397 U. S. 397; *King* v. *Smith*, 392 U. S. 309; *Goldberg* v. *Kelly*, 397 U. S. 254; *Dandridge* v. *Williams*, 397 U. S. 471; *Damico* v. *California*, 389 U. S. 416.

See also *Rinaldi* v. *Yeager*, 384 U. S. 305; *Swarb* v. *Lennox, ante*, p. 191; *Lindsey* v. *Normet, ante*, p. 56. These cases, arguably, involved only deprivations of property, but we found § 1343 (3) jurisdiction nonetheless.

[20] Difficulty in application has been one source of the commentators' dissatisfaction with the "personal liberties" limitation. See generally Note, 24 Vand. L. Rev. 990 (1971); Laufer, *Hague* v. *C. I. O.*: *Mr. Justice Stone's Test of Federal Jurisdiction—A Reappraisal*, 19 Buff. L. Rev. 547 (1970); Note, 1970 Duke L. J. 819; Note, 43 N. Y. U. L. Rev. 1208 (1968); Note, 66 Harv. L. Rev. 1285 (1953).

The federal courts have produced inconsistent results regarding § 1343 (3) jurisdiction of welfare claims. Compare *Roberts* v. *Harder*, 440 F. 2d 1229, with *Alvarado* v. *Schmidt*, 317 F. Supp. 1027. See also n. 19, *supra*. Yet, without always explaining why such interests are "personal" rather than "proprietary," courts have consistently found civil rights jurisdiction over suits alleging discrimination in the issuance of business licenses. See, *e. g., Barnes* v. *Merritt*, 376 F. 2d 8; *Glicker* v. *Michigan Liquor Control Comm'n*, 160 F. 2d 96. Similarly, claims involving discrimination in employment, *e. g., Birnbaum* v. *Trussell*, 371 F. 2d 672, or termination of leases in public housing projects, *e. g., Escalera* v. *New York City Housing Authority*, 425 F. 2d 853, are often found cognizable under § 1343 (3). How such "personal" interests are to be distinguished from the "property" interest in wages deposited in a savings account, as in this case, is not readily discernible. Compare this case with *Santiago* v. *McElroy*, 319 F. Supp. 284.

before us presents a good example of the conceptual difficulties created by the test.[21]

Such difficulties indicate that the dichotomy between personal liberties and property rights is a false one. Property does not have rights. People have rights. The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth a "personal" right, whether the "property" in question be a welfare check, a home, or a savings account. In fact, a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized. J. Locke, Of Civil Government 82–85 (1924); J. Adams, A Defence of the Constitutions of Government of the United States of America, in F. Coker, Democracy, Liberty, and Property 121–132 (1942); 1 W. Blackstone, Commentaries *138–140. Congress recognized these rights in 1871 when it enacted the predecessor of §§ 1983 and 1343 (3). We do no more than reaffirm the judgment of Congress today.

## II

Under 28 U. S. C. § 2283, a federal court may not "grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." The District Court relied upon this statute as an alternative ground for the dis-

---

[21] The District Court found that access to funds held in a savings account was indistinguishable from simple ownership of money. Thus garnishment of that account did not infringe personal rights. Mrs. Lynch, however, alleged that because of the garnishment she was unable to pay her rent on time and encountered difficulty maintaining her family on a minimally adequate diet. If these allegations are true, Mrs. Lynch's personal liberty could be profoundly affected by garnishment of her savings.

missal of the appellant's complaint. The appellant contends that § 2283 is inapplicable to this case because prejudgment garnishment under Conn. Gen. Stat. Rev. § 52–329 [22] is not a proceeding in state court. We agree.[23]

In Connecticut, garnishment is instituted without judicial order. *Ibid.;* 1 E. Stephenson, Connecticut Civil Procedure 151 (2d ed. 1970).[24] The levy of garnishment—usually effected by a deputy sheriff—does not confer jurisdiction on state courts and may, in fact,

---

[22] The statute provides:

"When the effects of the defendant in any civil action in which a judgment or decree for the payment of money may be rendered are concealed in the hands of his agent or trustee so that they cannot be found or attached, or when a debt is due from any person to such defendant, or when any debt, legacy or distributive share is or may become due to such defendant from the estate of any deceased person or insolvent debtor, the plaintiff may insert in his writ a direction to the officer to leave a true and attested copy thereof and of the accompanying complaint, at least twelve days in the case of the superior court or the court of common pleas, or six days in the case of the circuit court, before the session of the court to which it is returnable, with such agent, trustee or debtor of the defendant, or, as the case may be, with the executor, administrator or trustee of such estate, or at the usual place of abode of such garnishee; and from the time of leaving such copy all the effects of the defendant in the hands of any such garnishee, and any debt due from any such garnishee to the defendant, and any debt, legacy or distributive share, due or that may become due to him from such executor, administrator or trustee in insolvency, not exempt from execution, shall be secured in the hands of such garnishee to pay such judgment as the plaintiff may recover."

[23] Cf. *Roudebush* v. *Hartke, ante,* p. 15.

[24] Garnishment occurs at the beginning of the suit upon the direction of the plaintiff's lawyer, acting as a Commissioner of the Superior Court. Conn. Gen. Stat. Rev. §§ 51–85, 52–89. "The plaintiff or his attorney merely includes in his writ of summons a direction to the sheriff to make an attachment or serve garnishment process." 1 E. Stephenson, Connecticut Civil Procedure 151 (2d ed. 1970).

occur prior to commencement of an alleged creditor's suit. *Young* v. *Margiotta,* 136 Conn. 429, 433, 71 A. 2d 924, 926. Despite the state court's control over the plaintiff's docketed case, garnishment is "distinct from and independent of that action." *Potter* v. *Appleby,* 136 Conn. 641, 643, 73 A. 2d 819, 820. The garnished property is secured, not under authority of the court, but merely in the hands of the garnishee. Conn. Gen. Stat. Rev. § 52–329. Prejudgment garnishment is thus levied and maintained without the participation of the state courts.

In this case, the appellant sought to enjoin garnishment proceedings, not the finance company's suit on the promissory note. The District Court noted that "garnishment may be separated from the underlying in personam action," but held that § 2283 was a bar because the interference with existing creditors' suits caused by such an injunction "probably would be substantial." 318 F. Supp., at 1115. According to the appellees, interference would occur because garnishment is necessary to make any eventual judgment in the pending state suit effective. *Hill* v. *Martin,* 296 U. S. 393, 403.

This argument is not persuasive in the context of the Connecticut prejudgment garnishment scheme. Garnishment *might* serve to make a *subsequent* judgment effective. Cf. *Hill, supra; Manufacturers Record Publishing Co.* v. *Lauer,* 268 F. 2d 187, cert. denied, 361 U. S. 913; *Furnish* v. *Board of Medical Examiners of California,* 257 F. 2d 520, cert denied, 358 U. S. 882. But the garnishment was, in this case, an action taken by private parties who were not proceeding under a court's supervision [25] and who were using, as agents,

---

[25] The fact that the plaintiffs' attorneys are, formally, officers of the court does not convert the Connecticut garnishment process into a state court proceeding for § 2283 purposes, since the attorneys

state officials who were themselves not acting pursuant to a court order or under a court's authority.

In *Hill, supra,* we said that the "proceeding" that a federal court is forbidden to enjoin "includes all steps taken or which may be taken *in the state court or by its officers* from the *institution* to the close of the final process." *Id.,* at 403 (emphasis supplied). In this case, the garnishment occurred before the appellee corporation had served the appellant with process.

More important, the state court and its officers are insulated from control over the garnishment. Connecticut appears to be one of the few States authorizing an attorney for an alleged creditor to garnish or attach property without any participation by a judge or clerk of the court. Stephenson, *supra,* at 230. A person whose account has been seized can get only minimal relief at best.[26] The state courts have held that they cannot enjoin a garnishment on the ground that it was levied unconstitutionally. *Michael's Jewelers* v. *Handy,* 6 Conn. Cir. 103, 266 A. 2d 904; *Harris* v. *Barone,* 147 Conn. 233, 158 A. 2d 855. One assumption underlying § 2283 is that state courts will vindicate constitutional claims as fairly and efficiently as federal courts. But this assumption cannot obtain when the doors of the

have complete discretion to issue a writ. See n. 24, *supra; Sharkiewicz* v. *Smith,* 142 Conn. 410, 114 A. 2d 691; *Sachs* v. *Nussenbaum,* 92 Conn. 682, 104 A. 393.

[26] The courts have no authority to inquire into the probable validity of the creditor's claim, or whether special circumstances warrant provisional security for an alleged creditor. *Sachs* v. *Nussenbaum,* 92 Conn., at 689, 104 A., at 395. Prior to the termination of the litigation, a garnishment may be reduced or dissolved only upon a showing that the garnishment is excessive—*i. e.,* in excess of the creditor's apparent claim—or upon substitution of a bond with surety. Conn. Gen. Stat. Rev. §§ 52–302 and 52–304. *Black Watch Farms* v. *Dick,* 323 F. Supp. 100, 101–102. This involvement has been termed "meager." Stephenson, *supra,* at 154.

state courts are effectively closed to a person seeking to enjoin a garnishment on constitutional grounds.

Because of the extrajudicial nature of Connecticut garnishment, an injunction against its maintenance is not, therefore, barred by the terms of § 2283. In light of this conclusion, we need not decide whether § 1983 is an exception to § 2283 "expressly authorized by Act of Congress." We have explicitly left that question open in other decisions.[27] And we may put it to one side in this case because the state act that the federal court was asked to enjoin was not a proceeding "in a State court" within the meaning of § 2283.

We conclude, therefore, that the District Court had jurisdiction to entertain the appellant's suit for an injunction under § 1983. Accordingly, the judgment before us is reversed, and the case remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.

I agree with the Court that federal jurisdiction under 28 U. S. C. § 1343 is not limited to the adjudication of personal rights and if the disposition of this case turned solely on that issue I would without reservation join in the majority opinion. But I cannot agree either with the approach that the majority takes to the anti-

---

[27] See *Dombrowski* v. *Pfister*, 380 U. S. 479, 484 n. 2; *Cameron* v. *Johnson*, 390 U. S., at 613 n. 3; *Younger* v. *Harris*, 401 U. S. 37, 54. The circuits have divided on the question. Cf., *e. g.*, *Cooper* v. *Hutchinson*, 184 F. 2d 119, and *Baines* v. *City of Danville*, 337 F. 2d 579.

injunction statute, 28 U. S. C. § 2283, or its conclusion that the statute does not bar this suit. I do not mean to suggest that appellants' due process attack on the Connecticut garnishment statute is not substantial. It obviously is. *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969). Nevertheless, in my view, appellants should be required to press their constitutional attack in the state courts.

In Connecticut, garnishment or attachment is one method of beginning a lawsuit. Conn. Gen. Stat. Rev. § 52–329; 1 E. Stephenson, Connecticut Civil Procedure 156–157, 232–237 (2d ed. 1970). Of course, the requisite personal service upon a defendant is necessary to obtain *in personam* jurisdiction, Conn. Gen. Stat. Rev. § 52–54, as well as to secure an effective garnishment, Stephenson, *supra,* at 244, but as a matter of right in certain kinds of civil actions a plaintiff may simultaneously garnish a defendant's bank account and serve a summons upon the defendant, together with a complaint stating the nature of the underlying action. Conn. Gen. Stat. Rev. § 52–329. A state court obtains jurisdiction of the action and of questions concerning the garnishment when return of process is made to that court. Stephenson, *supra,* at 67. Garnishment is "ancillary to the main action for damages and cannot exist without such action." *Id.,* at 143. Its purpose, as the majority notes, is to secure property that will thus be made available for the satisfaction of a judgment. *Ibid.* A writ of garnishment may be issued by a judge of the court of jurisdiction, Conn. Gen. Stat. Rev. § 52–89 (Supp. 1969), but because garnishment in Connecticut, unlike most other States, is a matter of right and requires no prior judicial determination, the writ may also be issued by a court clerk or licensed attorney. Conn. Gen. Stat. Rev. § 51–85. In either

case, the matter is accomplished simply by completing a form.

Appellant Lynch brought this federal action to enjoin the garnishment more than seven months after the writ had been executed, the summons and complaint served, process returned, and the case docketed in Connecticut court. At the earliest moment that a federal injunction could have issued the state court proceeding was well under way. Despite this, the majority purports to sever the garnishment from the action that underlies it. The Court reasons that Connecticut garnishment is not a proceeding in state court because it is carried out by private parties not acting pursuant to a court order. *Ante,* at 554–555.

If the majority means that garnishment is a severable matter, independent of the main suit and for that reason outside of § 2283, then I would suppose it permissible for a federal court to enjoin any garnishment or attachment, whether obtained at the inception of a lawsuit, while it is in progress, or after judgment and for the purpose of execution. This approach to the anti-injunction statute, articulated in *Simon* v. *Southern R. Co.,* 236 U. S. 115, 124–125 (1915), was, I thought, laid to rest in *Hill* v. *Martin,* 296 U. S. 393, 403 (1935), where the Court construed "proceedings in any court of a State" comprehensively and as embracing

> "all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process. It applies to appellate as well as to original proceedings; and is independent of the doctrine of *res judicata.* It applies alike to action by the court and by its ministerial officers; applies not only to an execution issued on a judgment, but to any proceeding supplemental or an-

cillary taken with a view to making the suit or judgment effective." (Footnotes omitted.)

The Court today embarks on quite a different course and rejects not only *Hill* v. *Martin* but also a substantial body of federal court of appeals law to the effect that § 2283 bars federal court interference with executions on state court judgments. *E. g., Manufacturers Record Publishing Co.* v. *Lauer,* 268 F. 2d 187 (CA5), cert. denied, 361 U. S. 913 (1959); *Furnish* v. *Board of Medical Examiners of California,* 257 F. 2d 520 (CA9), cert. denied, 358 U. S. 882 (1958); *Norwood* v. *Parenteau,* 228 F. 2d 148 (CA8 1955), cert. denied, 351 U. S. 955 (1956).[1]

The Court also suggests that § 2283 is inapplicable here because no Connecticut court authorized the garnishment. Its view apparently is that a federal injunction would therefore not interfere with state court processes. Until now, however, it has been reasonably clear that § 2283 cannot be avoided by the simple expedient of enjoining parties instead of judges. *Oklahoma Packing Co.* v. *Oklahoma Gas & Electric Co.,* 309 U. S. 4, 9 (1940). Moreover, the Court's rationale proves too much. Contrary to the views expressed in *Hill* v. *Martin, supra,* state court ministerial officers could be enjoined at any time and for any purpose in the course of a litigation and without regard to § 2283. In addition, parties to state court litigation could be enjoined from performing any one or all of the tasks essential to the orderly progress of litigation so long as the acts in question are not carried out pursuant to court order. Depositions of parties and witnesses, interrogatories to parties, and subpoenas for witnesses are commonly pur-

---

[1] Some confusion persists whether a federal court may, consistently with § 2283, enjoin the operation of a state court judgment procured by fraud. See C. Wright, Law of Federal Courts 179–181 (2d ed. 1970). That question is not presented here.

sued without resort to a judge. Are these and other functions not performed under court order now subject to attack in federal court at the option of the offended state court litigant?

Today's decision will, I fear, create confusion by making the applicability of § 2283 turn on rules that are difficult to apply. The potential for conflict between state and federal courts will increase and the price for judicial errors will be paid by litigants and courts alike. The common sense of the matter, it seems to me, is that the garnishment at issue here is part and parcel of a state court proceeding now under way. Garnishment in Connecticut may be characterized as separate from the underlying action, but it is nonetheless a proceeding and derives its legitimacy from the suit it accompanies. At the time this federal action was brought, return of process had long since been completed and the state court had acquired jurisdiction of a straightforward cause of action, including questions of the legitimacy and constitutionality of the garnishment.

It also seems to me that, quite apart from § 2283, today's holding departs from such cases as *Stefanelli* v. *Minard,* 342 U. S. 117 (1951), and *Perez* v. *Ledesma,* 401 U. S. 82 (1971), which counsel against atomizing state litigation by enjoining, for example, the introduction of illegally obtained evidence, as well as from the more general admonitions of *Younger* v. *Harris,* 401 U. S. 37 (1971); *Samuels* v. *Mackell,* 401 U. S. 66 (1971); *Boyle* v. *Landry,* 401 U. S. 77 (1971); and *Perez* v. *Ledesma, supra,* against improvident exercise of a federal court's equitable powers to frustrate or interfere with the operations of state courts by adjudicating federal questions that are involved in state court litigation and which can be adjudicated there. As the Court said in *Stefanelli,* if such interventions were to be permitted, "[e]very question of procedural due proc-

ess of law—with its far-flung and undefined range— would invite a flanking movement against the system of State courts by resort to the federal forum, with review if need be to this Court, to determine the issue." 342 U. S., at 123. Such resort, if permitted, "would provide ready opportunities, which conscientious counsel might be bound to employ, to subvert the orderly, effective prosecution of local crime in local courts." *Id.*, at 123– 124.

Appellee Barrett invokes *Younger* and companion cases as a ground for affirming the judgment of the District Court. Of course, those cases involved federal injunctions against state criminal proceedings, but the relevant considerations, in my view, are equally applicable where state civil litigation is in progress, as is here the case.[2]

I would affirm the judgment of the court below.

---

[2] I thus would affirm whether or not 42 U. S. C. § 1983 is an exception to the bar of § 2283. That question is at issue in *Mitchum* v. *Foster*, No. 70–27, now *sub judice*.