**SOUTH CUTLER BAY, INC., a Florida corporation, Plaintiff,**

v.

**METROPOLITAN DADE COUNTY, FLORIDA, a political division of the State of Florida, et al., Defendants.**

**Civ. No. 72–1668.**

United States District Court,
S. D. Florida,
Miami Division.

Oct. 27, 1972.

Neil Flaxman, Miami, Fla., for plaintiff.

Stuart Simon, Dade County Atty., Robert L. Krawcheck, Asst. County Atty., Miami, Fla., for defendants.

## ORDER DENYING APPLICATION FOR TEMPORARY INJUNCTION

JAMES LAWRENCE KING, District Judge.

The plaintiff, South Cutler Bay, Inc., a Florida corporation, owns approximately 80 acres of land in Dade County, Florida. On May 4, 1972, pursuant to the authority of Ordinance No. 72–18 [1] of Metropolitan Dade County, the County Manager, R. Ray Goode, ordered a Building Moratorium on the plaintiff's property. The Moratorium was limited to the property of the plaintiff only.

On June 20, 1972, the Metropolitan Dade County Commissioners passed a Resolution continuing the moratorium for 120 days and directed the County Manager to investigate the possibility of a roll-back rezoning of the property. On the date of the scheduled expiration of the building moratorium, October 18, 1972, the County Commissioners ordered the County Manager to take steps to submit a proposal for rezoning of the plaintiff's property to the Zoning Appeals Board of Dade County, Florida.

The plaintiff instituted these proceedings on October 19, 1972, contending that its civil rights had been violated. The plaintiff alleges that in reliance upon the current zoning pertaining to the 80 acre parcel in effect at the time the plaintiff acquired the property, it entered into a $5,500,000.00 land acquisition and development loan contract as well as certain agreements and contracts with attorneys, architects, engineers and others. The interest on the loan is approximately $20,000.00 per month and the professional fees, which the plaintiff has agreed to pay, subject the plaintiff to an additional $15,000.00 per month in expenditures. It is alleged that the actions of the County Commission and the County Manager of Dade County have placed into serious jeopardy the $5,500,000.00 land acquisition and development loan in that the lender is threatening revocation of its loan commitment.

The jurisdictional issues and the application for temporary restraining order were heard in an emergency hearing October 20, 1972. Briefs supplied by the parties on October 24, 1972, expanded on the jurisdictional issues. Plaintiff asserts that this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(3) and (4) to hear the merits of his claims under 42 U.S.C. §§ 1983, 1985(3) and the fifth and fourteenth amendments to the Constitution.

The first issue raised by the parties is whether the Civil Rights Act permits federal relief where a property right rather than a personal right is at stake. A long line of cases since 1939 have echoed Chief Justice Stone's opinion that the Civil Rights Act protects only those rights "inherently incapable of pecuniary valuation." Hague v. CIO, 307 U.S. 496, 530, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (Stone, C. J., concurring). Plaintiff argues that the property rights asserted here are just as much civil rights as a man's right to free speech or association, and deserve the same federal protection under the Civil Rights Act. We wholeheartedly agree.

The rights to life, liberty and property, as well as those to free speech, a free press, and freedom of worship and assembly, were established as fundamental legal principles by the Declaration of In-

1. See Appendix.

dependence and the Bill of Rights. No one of them is more important than any other, and all must be cherished and protected as the foundation upon which our nation was conceived and built. To relegate any of these basic rights to a status inferior to that of another could only undermine the Constitution and lay waste to 200 years of increasingly secure democracy.

As each of these rights should be accorded equal status, so must all be applied equally to every economic and social group: to rich and poor, black and white, young and old, moderate and extremist, law-abiding and mischievous —in short, to all Americans.

Our courts have worked tirelessly to protect the meek and the outspoken in their quest for equality under the law. These efforts, however, must not be misunderstood by the general public to imply that only certain groups have civil rights. By protecting the rights of some, we safeguard the foundations of the liberties essential to all.

The public must recognize that although all Americans have equal civil rights, not everyone finds his rights equally in need of protection. A welfare recipient will not ordinarily need federal relief from discriminatory zoning laws affecting his home. Likewise, a middle American will not normally be discriminated against in employment, housing or public accommodations. Nor will the political moderate be likely to find himself arrested without due process for participating in a lawful demonstration. But should the tables ever turn, each will have protected the civil rights of the other.

This Circuit has been in the forefront of those honoring the proposition that civil rights are not just for the meek or the outspoken. The Fifth Circuit has ruled that District Courts have jurisdiction under the Civil Rights Act to protect, from the discriminatory application of state and local laws, a land owner whose land had been seized and was to be sold by the state, McGuire v. Sadler, 337 F.2d 902 (1961), a woman whose application for a retail liquor store operators license had been denied for no reason, Hornsby v. Allen, 326 F.2d 605 (1964), an owner of a garbage business about to lose his franchise, Mansell v. Saunders, 372 F.2d 573 (1967), and an apartment tenant who came home one night to find that her property was seized by her landlord without due process, Hall v. Garson, 430 F.2d 430 (1970). Significantly, the Fifth Circuit has expressly refused to adopt the personal rights-proprietary rights distinction. *Compare* Bussie v. Long, 383 F.2d 766 (1967) *with* Atlanta Bowling Center, Inc., v. Allen, 389 F.2d 713, 715 n. 9 (1968).

The Fifth Circuit's view was vindicated late last term when the Supreme Court explicitly rejected the distinction limiting Civil Rights Act protection to personal rights, declaring:

"Property does not have rights. People have rights. The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is, in truth, a 'personal' right, whether the 'property' in question be a welfare check, a home or a savings account. In fact, a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized. . . . Congress recognized these rights in 1871 when it enacted the predecessor of §§ 1983 and 1343(3). We do no more than reaffirm the judgment of Congress today." Lynch v. Household Finance Corp., 405 U.S. 538, 552, 92 S.Ct. 1113, 1122, 31 L.Ed.2d 424 (1972) (citations omitted).

Consequently, it is clear that far from preventing this Court from hearing an action involving property rights, the Civil Rights Act invests us with jurisdiction under § 1343(3) and (4) to hear § 1983 and § 1985(3) claims.

■ But defendants object that plaintiff, a corporation, is not a "person" entitled to seek relief under either § 1343(3) or § 1983. If the question was once in doubt, the weight of modern authority favors the view that corporations may bring suit under these sections. McCoy v. Providence Journal Co., 190 F.2d 760 (1st Cir.) *cert. denied* 342 U.S. 894, 72 S.Ct. 200, 96 L.Ed. 669 (1951); Adams v. Park Ridge, 293 F.2d 585 (7th Cir. 1961); *cf.* Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (8th Cir. 1972). *Contra,* Erlich v. Glasner, 274 F.Supp. 11 (D.C. Cal.), *affirmed* 418 F.2d 226 (9th Cir. 1967). Moreover, the logic of Lynch v. Household Finance Corp. compels this conclusion. *Compare* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 with Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

■ Defendants next contend that even if the Civil Rights Act permits us to take jurisdiction over cases of this sort, we may not take jurisdiction here because there is no "case or controversy," a prerequisite to judicial action under Article III of the Constitution. They argue that because the rezoning process under the ordinance challenged here has not yet been completed, it is still possible that the rezoning may never take place, in which case the constitutional issues raised by plaintiff would never materialize. But defendants mistake the thrust of plaintiff's complaint. The injury alleged results not from the rezoning, but from the county's freeze on building permits, allegedly the result of unconstitutional procedures authorized by the ordinance. Thus, we conclude that the controversy before us is a "real and substantial" one "admitting of specific relief" and is far from presenting a mere "hypothetical" state of facts. Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1931). Neither Coastal Petroleum Co. v. Collins, 234 F.2d 319 (5th Cir. 1956), nor Manila Investment Co. v. Trammell, 239 U.S. 31, 32, 36 S.Ct. 12, 60 L.Ed. 129 (1915), is to the contrary: no contractual relationship exists between plaintiff and defendants here.

■ Defendants proceed to argue that the Court may not take jurisdiction because plaintiff has not exhausted his state administrative and judicial remedies. But the general rule is well settled that exhaustion is not required in civil rights cases. McNeese v. Board of Educ., 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Moreno v. Henckel, 431 F.2d 1299 (5th Cir. 1970); Gilmore v. James, 274 F.Supp. 75 (D.Tex.1968), *affirmed* 389 U.S. 572, 88 S.Ct. 695, 19 L.Ed.2d 783 (1968); *compare* Hall v. Garson, 430 F.2d 430 (5th Cir. 1970) *with* Schwartz v. Galveston Independent School Dist., 309 F.Supp. 1034 (D.Tex. 1970). That these cases remain good law on the exhaustion issue, if not the abstention doctrine, in the wake of Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971), is evidenced by the Fifth Circuit's recent statement that *Askew* does not alter the rule that no exhaustion is required in civil rights cases. Hobbs v. Thompson, 448 F.2d 456, 467 (5th Cir. 1971). We are therefore of the opinion that plaintiffs had no need to exhaust either state administrative or judicial remedies as a jurisdictional prerequisite to federal relief.

■ Despite the fact that this Court has jurisdiction under the Civil Rights Act, an important question remains: must we abstain from exercising our jurisdiction? If *Monroe* and *McNeese* were once viewed as ruling out abstention in any civil rights case, that is no longer the law. As the Fifth Circuit has recognized, the Supreme Court has now applied "traditional abstention principles to one facet of the civil rights area." 448 F.2d at 469. The Court ruled that where a state court has been presented with "primarily state law claims under the Florida Constitution, which claims, if sustained, will obviate the necessity of determining the Fourteenth Amendment question," the feder-

al court must abstain from exercising its jurisdiction. Askew v. Hargrave, 401 U.S. 476, 478, 91 S.Ct. 856, 858, 28 L.Ed.2d 196 (1971); *see* Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed. 2d 68 (1970). Prior to the filing of this action, not one, but two cases were pending in the state court challenging the constitutionality of the ordinance attacked here. Jason v. Dade County, Case No. 72–9712; Grimmett v. Dade County, Case No. 72–4980. The former case has now reached the appellate level. As the numerous citations to Florida cases in plaintiff's brief make clear, issues of Florida law on which the state supreme court has spoken cannot but predominate in any attack on the ordinance, and their decision will obviate the need for federal relief. Thus, the United States Supreme Court, by its decision in *Askew*, has clearly decided the issue of whether or not we should abstain in this case. We have no choice but to refrain from exercising our jurisdiction.

■ It goes without saying, of course, that where we are compelled to abstain from exercising our civil rights jurisdiction, we must also abstain from exercising our federal question jurisdiction under 28 U.S.C. § 1331. Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Hill v. City of El Paso, 437 F.2d 352 (5th Cir. 1971); Creel v. City of Atlanta, 399 F.2d 777 (5th Cir. 1968); Brown v. Pearl River Valley Water Supply Dist., 292 F.2d 395 (5th Cir. 1961).

Consistent with the requirement that, in abstaining, this court must retain jurisdiction pending a final determination by the Florida appellate courts, it is,

Ordered and adjudged that:

1. Plaintiff's pending motion for a temporary injunction be and the same is hereby denied.

2. Jurisdiction is retained, without prejudice to plaintiff's right to seek review of this order in the United States Court of Appeals for the Fifth Circuit, pending a final determination of the validity of Ordinance No. 72–18 by the state courts.

## APPENDIX

### ORDINANCE NO. 72–18

Ordinance Amending Chapter 33, Dade County Code, Providing for Moratoria on the Issuance of Building Permits for the Purpose of Protecting Community Development; Providing for Administrative Moratoria; Providing for Public Hearings to Determine the Reasonable Necessity of Moratoria; Providing for Extensions of Moratoria, after Public Hearing, Where Reasonably Necessary; Providing for Terminations of Moratoria; Providing for the Issuance of Building Permits for Non-Deleterious Structures During Moratoria; Providing for Inclusion in the Dade County Code; Providing a Severability Clause; Providing an Effective Date.

WHEREAS, the zoning ordinances of Dade County are predicated on a comprehensive plan, and are designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to promote adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate adequate transportation, water sewage treatment, schools, parks and other public requirements; and

WHEREAS, the continual process of growth and change within Dade County requires the continuing analysis of living, working and production conditions; and

WHEREAS, the continual flux of social patterns in the urban community often requires intensive restudy of areas of the community; and

WHEREAS, the changing social patterns often cause existing zoning dis-

tricts to become outdated, inequitable, unbalanced and inappropriate as applied; and

WHEREAS, it is in the public interest to make a comprehensive determination as to whether existing zoning districts are appropriate, where it appears that changing social patterns have cast doubt on their propriety; and

WHEREAS, it is unreasonable to allow the issuance of building permits in areas where environmental considerations and changing social patterns have cast doubt on the propriety of existing zoning districts as applied thereto; and

WHEREAS, the health, safety, welfare and morals of the people of Dade County cannot be fully protected without the establishment of a procedure for the unhindered review of the propriety of zoning classifications as applied,

Now, Therefore, be it enacted by Metropolitan Dade County, Florida, pursuant to Article 7 of the Home Rule Charter of Metropolitan Dade County, Florida:

*Section 1.* Chapter 33, Code of Metropolitan Dade County, Florida is hereby amended by adding the following sections thereto:

"Section 33–319. Administrative Building Moratoria.

(a) Whenever it shall be made to appear to the County Manager that it is in the public interest to make a comprehensive determination as to whether existing county zoning districts applying to a portion of the area of Dade County are appropriate, and it is further made to appear to him that the said existing zoning districts may be detrimental to the said area should they continue to remain applicable and building permits be issued predicated thereon the County Manager shall immediately issue his administrative order delineating the area in question and prohibiting the issuance of building permits therein.

(b) Any administrative order issued pursuant to subsection (a) shall be complied with by all Dade County personnel and shall be effective until reversed, modified or superseded by order of the board of county commissioners.

(c) Immediately upon issuance of any administrative order pursuant to subsection (a) the County Manager shall notify the Clerk of the board of county commissioners, whose duty it shall then be to place the matter before the board of county commissioners as soon as is reasonably practicable for the calling of a public hearing.

(d) After being notified by the Clerk, the board of county commissioners shall call a public hearing at the earliest practicable time with reasonable notice by publication in a newspaper of general circulation in Dade County.

(e) At the public hearing the board of county commissioners shall inquire into the propriety of a building moratorium and may reverse, modify or supersede any moratorium order previously issued. The board's determination shall be predicated upon the reasonable necessity for a detailed comprehensive analysis of the area in question and the probability of detriment to the character of the area by the continued application of the existing zoning districts.

(f) Should the board of county commissioners determine that a building moratorium is reasonably necessary, it shall order the same and direct that no building permits be issued within the af-

fected area. The board's order shall fix a time within which the County Manager shall report back to the board with his recommendations relating to appropriate zoning districts for the affected area. The said time limitation shall be a reasonable one, predicated upon the time needed for a comprehensive analysis of the area.

(g) Should the County Manager be unable to report back to the board within the time prescribed by its moratorium order, upon timely request by the County Manager and after public hearing on the need therefor, the board may reasonably extend the time limitation.

(h) Upon notification by the County Manager that he is prepared to submit his recommendations relating to the affected area, the board of county commissioners shall call a public hearing thereon at the earliest practicable time, after reasonable notice by publication in a newspaper of general publication in Dade County. After said public hearing the board shall make its determination as to whether the zoning districts shall remain the same or shall be changed. Should the board determine that the zoning districts shall remain the same, it shall immediately issue its order terminating the building moratorium. Should the board determine that the applicable zoning districts should be changed, or new districts created therefor, it shall issue its order continuing the building moratorium and shall immediately take the actions required elsewhere within the Dade County Code for such changes.

(i) Upon the completion of all zoning district changes relating to the affected area, the board shall issue its order terminating the building moratorium.

"Section 33–320. Other Building Moratoria

(a) Should any person make written application to the County Manager for the issuance of an administrative order provided by Section 33–319(a), Dade County Code, and the County Manager refuses to issue such order, or fails to take action thereon within thirty days, such person may make written application to the board of county commissioners for the issuance of a building moratorium by that board. Such application to the board shall be filed with the Clerk of the board of county commissioners, whose duty it shall be to place the matter before the board of county commissioners as soon as is reasonably practicable for the board's determination as to whether a public hearing shall be called thereon. The County Manager shall be notified by the Clerk of the date that the matter is to be considered by the board. The word "person" as used in this subsection includes, but is not limited to, any individual, firm, corporation, and governmental entity, including the Planning Advisory Board, and the Zoning Appeals Board.

(b) Should the board determine that a public hearing should be held as to whether a building moratorium is appropriate, it shall call the same for the earliest practicable date and give reasonable notice thereof by publication in a newspaper of general circulation in Dade County. Pending the public hearing the board may issue an order prohibiting the issuance of building permits in the affected area.

**1212**

(c) The procedure to be followed for this Section, after the completion of the steps provided in subsection (a) and (b) above, is that set forth in Section 33–319(e) through (i), Dade County Code.

Section 33–321. Exceptions.

Notwithstanding the issuance of any moratorium order, the County Manager may authorize the issuance of building permits for non-deleterious items including, but not limited to, fences, repairs and like matters, where he determines that such permit will not affect the outcome of the planning study.

Section 33–322. Variances, Special Exceptions and Zoning Changes.

During the existence of any building moratorium, no applications for variances, special exceptions or zoning district changes within the affected area shall be acted upon by any county agency, except as provided in Section 33–319(h)."

*Section 2. Inclusion in the Code.* It is the intention of the Board of County Commissioners, and it is hereby ordained that the provisions of this ordinance shall become and be made a part of the Code of Metropolitan Dade County, Florida. The sections of this ordinance may be renumbered or relettered to accomplish such intention, and the word "ordinance" may be changed to "section", "article", or other appropriate word.

*Section 3. Severability.* If any section, subsection, sentence, clause or provision of this ordinance is held invalid, the remainder of this ordinance shall not be affected thereby.

*Section 4. Effective Date.* The provisions of this ordinance shall become effective immediately upon enactment.

PASSED AND ADOPTED MARCH 14, 1972.

Approved by County Attorney as to form and legal sufficiency.