PEARL ASSUR. CO., LIMITED, OF LONDON, ENGLAND, et al. v. HARRINGTON, Commissioner of Insurance of Massachusetts.

No. 746.

District Court, D. Massachusetts.

March 26, 1941.

Judgment Affirmed June 2, 1941.

See 61 S.Ct. 1120, 85 L.Ed. ——.

Richard J. Cotter and Warner, Stackpole, Stetson & Bradlee, all of Boston, Mass., and Basil O'Connor, of New York City, for plaintiffs.

Paul A. Dever, Atty. Gen., and Edward O. Proctor, Asst. Atty. Gen., for defendant.

Before FRANKFURTER, Circuit Justice, MAGRUDER, Circuit Judge, and FORD, District Judge.

FRANKFURTER, Circuit Justice.

Massachusetts, in common with other states, demands compliance with its notions of policy as expressed in a long sequence of legislation before an alien corporation can engage in the business of insurance within the Commonwealth. To its historic requirements, see Patterson, The Insurance Commissioner in the United States, p. 513 et seq., it added by a statute enacted in 1920 that such a corporation must have "as its resident manager in the United States, a citizen or corporation of the United States approved by the commissioner [of Insurance]". Mass.Gen.Laws, c. 175, § 155. Having satisfied the statutory conditions, including the designation of an American citizen as its resident manager in the United States, Pearl Assurance Company, Ltd., an English corporation, was given leave in 1932 to pursue its business in Massachusetts. Such leave was renewed from year to year until the Commissioner advised the Company that its license would not be renewed on its expiration in June, 1940. This step was taken by the Commissioner because Pearl on January 1, 1940, had made Carlsson, a British subject, its resident manager. To adjust the matter, negotiations between the Commissioner and Pearl followed, which led to a proposal by Pearl that it appoint as manager a corporation to be formed under the laws of New York. Carlsson was to be president thereof, and the proposed other officers and directors, though American citizens, were subordinates of Carlsson. The Commissioner rejected this proposal, whereupon Pearl, and Carlsson in his own right, deeming the Act of 1920 violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment and of treaties between Great Britain and the United States, brought this suit for interlocutory and permanent injunctions. A temporary restraining order having been granted, the present court of three judges was convened. 28 U.S.C. § 380, 28 U.S.C.A. § 380. The case is before us on pleadings, affidavits, and a statement of agreed facts. The issues were thoroughly canvassed in oral argument, which was supplemented by able briefs.

If Massachusetts, as part of the price of admission, has power to insist that an American citizen be resident manager of an insurance corporation created by a foreign nation, an alien who is thereby precluded from such employment can have no grievance. If such a provision is a permissive exercise of state policy toward alien insurance companies, the denial of this particular economic opportunity to individual aliens is a necessary consequence of state control over corporate insurance enterprise. Therefore, Carlsson's claim is contingent upon the validity of Pearl's claim that Massachusetts could not impose the condition now challenged.

And so we are brought to Pearl's claim. Has Massachusetts exceeded constitutional bounds in making the requirement it has made? The very special subjection of the insurance business to close and continuous governmental control sets our problem in appropriate perspective. The reasons which underlie such assertion of political authority and the extent to which states may go in the exercise of their power have too recently been indicated to call for elaboration here. Osborn v. Ozlin, 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074. The act under discussion is only one more in a series of legislative controls especially designed for the state's protection in the conduct of the insurance business by aliens. It is not our concern here to appraise the factors of intrinsic financial reliability as between American enterprises and British companies of historic reputation. Our duty is strictly limited to ascertaining whether Massachusetts has moved within its legislative sphere. Since 1878 the Commonwealth has required that foreign insurance companies deposit funds with an officer of the Commonwealth and with trustees "who are citizens or corporations of the United States" to protect American policyholders. Mass.Acts 1878, c. 130, §§ 1, 2; Mass.Gen. Laws, c. 175, §§ 155, 156. In practical administration this safeguarding of local policyholders greatly proved its worth when, during the late war, fire insurance companies of enemy countries and their allies were prevented from writing further insurance in this country. To the statutory policy of the Commonwealth was apparently due in no small measure the solvency of

the United States branches of these alien companies. Sixty-third Annual Report, Massachusetts Insurance Commissioner (1917) Part I, pp. viii, ix. If such be not merely state policy of long standing but one that had proved itself efficacious, when put to the test of practicalities, it is not difficult to understand why the Commonwealth should find an added measure of security in requiring the active head of an alien insurance business to give that devotion to American interests which citizenship implies. This is not to suggest, even remotely, any grounds of suspicion or disquietude, but merely to assert that the Commonwealth may take measures in safeguarding interests as far-reaching as those represented by insurance against the subjection of the company official who has the ultimate control of an alien insurance enterprise to the pressures of competing loyalties. We do well to scrutinize legislation that avowedly discriminates against aliens. But national loyalties do exist, and a state is not barred from recognizing the relevant play of such loyalties. Compare Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283; Hines v. Davidowitz, 61 S.Ct. 399, 85 L.Ed. ——, decided January 20, 1941; United States v. Carolene Products Co., 304 U.S. 144, 152, note 4, 58 S.Ct. 778, 82 L.Ed. 1234. Having regard to the place of insurance companies in the states' social and economic life, the consequent legislative control over them, the special status of alien companies and the concrete history of legislation in Massachusetts affecting those companies, we conclude that so far as the Constitution is concerned Massachusetts was not barred from requiring the headship of an alien insurance company to be Ameri-can, as a condition for doing business in Massachusetts.

But it is urged that were Massachusetts otherwise free to pass such a statute, that freedom has been denied her by two controlling treaties between Great Britain and the United States. From the Jay Treaty of 1794, 8 Stat. 116, and the Treaty of 1815 to Regulate Commerce and Navigation, 8 Stat. 228, the claim is drawn. Article III of the Jay Treaty and Article I of the Treaty of 1815 are the specific reliances. The Jay Treaty permits "his Majesty's subjects, and * * * the citizens of the United States * * * freely to carry on trade and commerce with each other", while, according to the Treaty of 1815, "the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce, but subject always to the laws and statutes of the two countries, respectively".[1] Even assuming, without deciding, that the corporate form of conducting insurance is within the treaties, cf. Bobe v. Lloyds, 2 Cir., 10 F.2d 730; United States & C. A. W. E. Corp. v. Lloyds, D.C.S.D.N.Y., 291 F. 889, the reservation of the Treaty of 1815 explicitly, and the Jay Treaty impliedly, permit regulations conventionally justified as exercises of the police power. The times admonish us to be fastidiously scrupulous in the observance of international agreements. See Bacardi Corp. v. Domenech, 311 U.S. 150, 61 S.Ct. 219, 85 L.Ed. ——, decided December 9, 1940. State legislation bunglingly or skillfully contrived to evade an international obligation undertaken by the United States should unhesitatingly be stricken down. But we find no such consequence in the act before us. It is, as we have seen, part of an historic pol-

[1] Jay Treaty, Article III: "It is agreed that it shall at all times be free to his Majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling on either side of the said boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the country within the limits of the Hudson's bay Company only excepted) and to navigate all the lakes, rivers and waters thereof, and freely to carry on trade and commerce with each other. * * *"

Treaty of 1815, Article I: "There shall be between the territories of the United States of America, and all the territories of his Britannick majesty in Europe, a reciprocal liberty of commerce. The inhabitants of the two countries, respectively, shall have liberty freely and securely to come with their ships and cargoes to all such places, ports, and rivers, in the territories aforesaid, to which other foreigners are permitted to come, to enter into the same, and to remain and reside in any parts of the said territories, respectively; also to hire and occupy houses and warehouses for the purposes of their commerce; and, generally, the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce, but subject always to the laws and statutes of the two countries, respectively."

414

icy of Massachusetts for the safe conduct of a financial enterprise on which its citizens are peculiarly dependent. A sensible and just reading of the treaties certainly does not withdraw the normal scope of the police power from the states.

Two minor questions remain. They both arise out of interpretations which the Commissioner of Insurance has given the act. Were the record clearer or the questions less free from doubt it might be the part of wisdom to hold the case in order to allow an appropriate suit to be brought in a state court for an authoritative adjudication of the local matters of construction. See Railroad Commission v. Pullman Co., 61 S.Ct. 643, 85 L.Ed. —, decided March 3, 1941. But in view of the course that this action has taken, we deem it best to dispose of the litigation.

■ The Commissioner has ruled that the statute applies only to companies seeking admission after its enactment. This construction has been acted upon for twenty years. Accepting it, as we do, we do not find the drawing of such a line the denial of equal protection. Suffice it to say that "the 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time". Sperry & Hutchinson Co. v. Rhodes, 220 U.S. 502, 505, 31 S.Ct. 490, 491, 55 L.Ed. 561.

■■ Finally, it is urged that the Commissioner disregarded the statute in refusing Pearl's offer to designate as manager a proposed New York corporation. The statute, it will be recalled, allows a corporation of the United States to serve as resident manager provided that it be "approved by the commissioner". A broad discretion is thus confided. Considering the delicate individual problem presented by every application for admission we do not find this to be a case in which the court may properly override the judgment of the Commissioner. To do so would be to disregard, in the language of Mr. Justice Holmes, "the important rule, which we desire to emphasize, that no injunction ought to issue against officers of a State clothed with authority to enforce the law in question, unless in a case reasonably free from doubt and when necessary to prevent great and irreparable injury". Massachusetts State Grange v. Benton, 272 U.S. 525, 527, 47 S. Ct. 189, 190, 71 L.Ed. 387; see also Hawks v. Hamill, 288 U.S. 52, 61, 53 S.Ct. 240, 77 L.

Ed. 610; Fox v. Standard Oil Co., 294 U. S. 87, 96, 97, 55 S.Ct. 333, 79 L.Ed. 780.

Accordingly, appropriate findings are filed, and a decree will be entered terminating the restraining order and dismissing the complaint.