(No. 42487.-

THE CITY OF CHICAGO, Appellee, v. PETER WEISS *et al.*, Appellants.

*Opinion filed March 30, 1972.*

SCHAEFER, J., took no part.

PETER WEISS, *pro se,* ARTHUR KINOY, of Newark, New Jersey, and THOMAS P. SULLIVAN and RUSSELL J. HOOVER, of JENNER & BLOCK, of Chicago, for appellant Peter Weiss.

DAVID J. KRUPP, MICHAEL L. SHAKMAN, and JULIE H. FRIEDMAN, all of Chicago (DEVOE, SHADUR, PLOTKIN, KRUPP & MILLER, of counsel), for all other appellants.

RICHARD L. CURRY, Corporation Counsel, of Chicago (WILLIAM R. QUINLAN and RICHARD F. FRIEDMAN, Assistants Corporation Counsel, of counsel), for appellee.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendants, Peter Weiss, Richard J. Neuhaus, James Murray Kempton, Jane Buchenholz, Patricia Saltonstall, Georgianna Cestro, Andrew Robinson, Davis Borden, Ellen Miller, Ellis Boal, Franklin Miller, Sema Lederman and Rose Brooks, appeal from the judgments of the circuit court of Cook County finding them guilty, following a bench trial, of disorderly conduct in violation of section 193—1 of the Municipal Code of the City of Chicago. Defendants Weiss and Neuhaus were each fined $400; defendant Kempton, $250; and each of the other defendants, $200. Costs were assessed against each defendant.

Section 193—1, in pertinent part, provides: "A person commits disorderly conduct when he knowingly: *** (d) Fails to obey a lawful order of dispersal by a person

known by him to be a peace officer under circumstances where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm ***."

The Democratic National Convention was held in Chicago during the last week of August, 1968, and the occurrence out of which these cases arose took place on the evening of August 29, 1968.

The leaders of various dissident groups had announced earlier that protesters would disrupt the convention and the city. Leaders of two dissident groups, the Youth International Party (Yippies), and the National Mobilization Committee to end the war in Viet Nam (MOB), met with representatives of the mayor's office concerning the use of public facilities during the week of the convention. It was agreed that the public facilities of the city were to be made available to members of the Yippies and MOB, so long as they were used in a peaceful and orderly manner, but the city refused to approve their plans to sleep in the parks for the reason that park ordinances of long standing prohibited use of the parks after 11:00 P.M. The city also refused to approve their plans for demonstrations in the area immediately adjacent to the International Amphitheatre, the site of the convention, because a mass assembly of people might interfere with the security preparations of both Federal and local authorities.

MOB, Rennie Davis, Tom Hayden, Mark Simons, Mary Lou Nowka, Marie Zelek and Linda Turner filed an action in the United States District Court for the Northern District of Illinois seeking an injunction to prohibit the officials of the city and park district from interfering with the meetings, parades and demonstrations they planned, and from interfering with their members who intended to sleep in the parks. The plaintiffs argued that they had a right to conduct a massive demonstration within "eyeshot" of the Amphitheatre on the evening of the nomina-

tions by the Democratic National Convention, and the defendant local authorities contended that the proposed sites could not be made available because of traffic and security considerations in that area. The district court held that alternative routes of march and assembly suggested by the local officials showed that they had acted in a reasonable and nondiscriminatory manner to preserve public safety and convenience at the site of the convention without depriving plaintiffs and other protesters of their rights of free speech and public assembly. The court also held that the plaintiffs did not have a right to sleep in the parks.

There were numerous demonstrations and marches by various groups from Sunday, August 25, through Thursday, August 29. These marches and demonstrations, which took place in and around the downtown area of the city, several miles north and east of the Amphitheatre, produced a number of confrontations with the police. The protesters made several attempts to march to the Amphitheatre, and to sleep in the parks. Violent confrontations were experienced on the evenings of August 25, 26, and 27, when the police cleared Lincoln Park of persons who wanted to sleep there. About 8:00 P.M. on Wednesday, August 28, a violent and much publicized confrontation occurred in front of the Conrad Hilton Hotel. On the night of August 28, 1968, following adjournment of the Democratic Convention until the next day, 5 of the defendants attended a meeting at the Amphitheatre at which the participants agreed to assemble the next evening in front of the Conrad Hilton Hotel to protest occurrences, particularly alleged acts of police brutality, which took place during that day.

About 2:00 P.M. on August 29, a large group began to assemble in Grant Park across from the Hilton Hotel. This group was addressed by a number of speakers, including Senator Eugene McCarthy, Dick Gregory, Reverend Ralph Abernathy, Reverend Andrew Young, and Pierre Salinger.

About 4:00 P.M. some 2,000 of the group began to march from Grant Park to the Amphitheatre. About 4:30 P.M. the police stopped the march at 16th Street and Michigan Avenue. Deputy Superintendent of Police James Rochford told the marchers that the Secret Service was seriously concerned about the safety of the candidates and asked the demonstrators to return to the Grant Park area where they could demonstrate "to their heart's content."

Most of the group returned to Grant Park. A small part of the group, approximately 30 in number, proceeded south into a Negro residential neighborhood. Several squad cars accompanied this group. The residents of the area were heckling the group, and at 31st Street the police walked with the marchers. Some of the marchers began to fall out of the march, and when the group reached 41st Street about 6:00 P.M. there was a brief scuffle with some Negro youths. These remaining marchers accepted a police offer of escort out of the area.

In the meantime the main group had returned to, and was still assembled in, Grant Park. At approximately 6:30 P.M., General Richard T. Dunn, the commanding officer of the Illinois National Guard, met with Dick Gregory in front of the Hilton Hotel. He told Gregory that 18th Street had been selected as the point beyond which it was not safe for the demonstrators to proceed and that the demonstrators could march as a group anywhere in the area bounded by 18th Street on the south and State Street on the west. Gregory said he would lead the march south on Michigan Avenue to 18th Street. General Dunn said he would meet with representatives of the city, the Secret Service, and the United States District Attorney's office at 18th Street and Michigan Avenue and decide if the march could proceed further.

At approximately 7:20 P.M., approximately 3,000 marchers started south on Michigan Avenue. They marched 3 and 4 abreast on the east sidewalk. About 450 National Guardsmen walked in the street next to them.

The marchers stayed on the sidewalk, and as they proceeded south there was some chanting and a few vulgar remarks but no violence. The group reached the intersection of 18th and Michigan at approximately 8:30 P.M. There Michigan Avenue had been barricaded with jeeps and barbed wire, and there was a line of National Guardsmen, in full battle regalia, positioned diagonally from the northeast corner to the southwest corner of the intersection. Behind the Guardsmen to the south were police, and the testimony shows there were approximately 1,250 National Guardsmen and 120 policemen in the area. North of the intersection was a television van equipped with spotlights. As the march was halted at the intersection, the marchers "bunched up" and filled the street.

The marchers were told that they could turn west on 18th Street or go north, but that they would be arrested if they proceeded south. There was considerable discussion between Guard and police officers and leaders of the march, but a stalemate occurred as the marchers refused to go any direction but south, and the National Guard refused to permit them to go south. This situation continued for about 45 minutes to an hour and tensions began to build. Then the arrests began. Any marchers proceeding south were permitted to go through a corridor in the Guard line where they were arrested by the police and placed in a police van. In a period of approximately one hour, 90 to 100 individuals, including all of the defendants, were arrested. Very shortly thereafter an announcement was made that there would be no further arrests, and the arrest corridor was closed off. About 15 or 20 minutes after the arrests were concluded, the marchers surged forward. The Guard line pushed the demonstrators back and released tear gas. The marchers dispersed and returned to Grant Park.

As grounds for reversal, defendants contend first that section 193—1(d) of the Municipal Code of Chicago is unconstitutionally vague and overbroad on its face. They

acknowledge that in *City of Chicago v. Fort (1970), 46 Ill.2d 12; City of Chicago v. Jacobs (1970), 46 Ill.2d 214;*and *City of Chicago v. Greene (1970), 47 Ill.2d 30, cert. denied (1971), 402 U.S. 996, 29 L.Ed.2d 162, 91 S.Ct. 2180,* this court considered and rejected the contentions here presented, but argue that *Coates v. City of Cincinnati (1971), 402 U.S. 611, 29 L.Ed.2d 214, 91 S.Ct. 1686,* decided subsequent to *Greene,* requires reconsideration and reversal of our prior holdings.

The ordinance in *Coates,* insofar as here relevant, provides: "It shall be unlawful for three or more persons to assemble, except at a public meeting of citizens, on any of the sidewalks, street corners, vacant lots, or mouths of alleys, and there conduct themselves in a manner annoying to persons passing by, or occupants of adjacent buildings." 402 U.S. 611, n.1, 29 L.Ed.2d 214, 216.

The Court in holding the ordinance so vague as to be invalid said: "Thus, the ordinance is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." (402 U.S. 611, 29 L.Ed.2d 214, 217, 91 S.Ct. 1686, 1688.) In our opinion the ordinances are clearly distinguishable, and we adhere to our decision in *City of Chicago v. Fort (1970), 46 Ill.2d 12,* wherein at page 16 we said, "*** the ordinance defines boundaries sufficiently distinct for us to review the reasonableness of the peace officer's on-the-spot decision that three or more people in the immediate vicinity were engaged in acts of disorderly conduct."

Defendants' principal contention is that assuming, *arguendo,* that the ordinance is constitutional on its face, the manner in which it was applied to these defendants renders it unconstitutional. They argue that the order was not one of dispersal within the contemplation of the ordinance, for the reason that, although it prohibited their going to the south, it did not order them to disperse. They

argue further that the order was unlawful for the reason that when given they were peacefully engaged in the exercise of their constitutional rights, there was then present no element of violence or disorderly conduct, and that whether the order was lawful must be determined as of the time they were barred from marching south and cannot be decided on the basis of disorderly conduct by other persons subsequent to the allegedly unlawful interference with their march to the Amphitheatre. They contend that although the ordinance might possibly be constitutionally applied to "non-speech" activities it cannot survive scrutiny under first amendment tests, and they state, correctly, that because a claim of a constitutionally protected right is involved, this court may not apply to the findings of the trial court the same tests as are used in other cases, but must itself examine the whole record. *(Cox v. Louisiana, 379 U.S. 536, 545, 13 L.Ed.2d 471, 478-479, 85 S.Ct. 453, 459.)* We note, parenthetically, that the record is 6,000 pages in length.

It is the city's position that the lawfulness of the order not to proceed south is not an issue in the case. The city argues that even if the order were not lawful, the arrests of the defendants were proper and the convictions must be affirmed because the evidence shows that at the time of the arrests there is no question that disorderly conduct as defined by paragraph (a) of section 193–1 was committed, and in fact, a great deal of violence was then in progress. Alternatively plaintiff argues that the order, when originally given, was lawful.

The first question to be determined is whether the order not to proceed south of 18th Street was an order of dispersal under section 193–1(d). It is apparent from the record that the police and National Guard gave no order, and made no attempt, to completely disperse the march when it reached the intersection. The demonstrators were free to continue their march west or return north. The order not to proceed south was given on numerous

occasions over a bull horn and the demonstrators were fully advised that they would be arrested if they did proceed south. The clear intent of this order was that the march would be dispersed if, and as, it attempted to move south, and it was an order of dispersal within the meaning of section 193—1(d).

The next issue to be determined is whether the order not to proceed south was "lawful" as required by section 193—1(d). The lawfulness of the order must be determined as of the time when it was given, when, admittedly, the march continued to be peaceful and orderly, and if unlawful at that time it cannot be rendered lawful by the violence which followed the refusal to permit the march to proceed south of 18th Street.

As stated by the Supreme Court in *Cox v. Louisiana, 379 U.S. 536, 554, 13 L.Ed.2d 471, 483, 85 S.Ct. 453, 464,* the contention presented "raises an issue with which this Court has dealt in many decisions, that is, the right of a State or municipality to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly."

The court went on to say, "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy." (379 U.S. 536, at 554, 13 L.Ed. 2d 471, at 484, 85 S.Ct. 453, at 464.) "We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech." (379 U.S. 536, at 555, 13

L.Ed.2d 471, at 484, 85 S.Ct. 453, at 464.) "We also reaffirm the repeated decisions of this Court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations." *Cox v. Louisiana, 379 U.S. 559, at 574, 14 L.Ed.2d 487, at 498, 85 S.Ct. 476, at 486.* 487, 498, 85 S.Ct. 476, at 486.

As required by *Cox,* we have examined the entire record and conclude that the order not to proceed south of 18th Street was lawful when given. The record reflects numerous outbreaks of violence in various parts of the city, and the testimony of Deputy Superintendent of Police Rochford persuades us that there was a reasonable basis for the fear that a march of 3,000 demonstrators which presented no immediate threat of violence in the industrial area which lay north of 18th Street might, if permitted to move into a densely populated area in which violence had recently occurred, present a serious threat to the peace and safety of the community. Further we find the testimony of Commanders James Riordan and Robert Harness of the Chicago Police Department and General Dunn of the National Guard supportive of Deputy Superintendent Rochford's opinion that permitting the march to proceed south of 18th Street would present a threat to the peace and security of the area.

We are cognizant of defendants' contention that with 1,250 Guardsmen and 120 police immediately available, any difficulty which arose could be controlled. We recognize that the police may not stop a peaceful demonstration merely because a hostile crowd which does not agree with the views of the demonstrators threatens violence and, in fact, owe a duty to protect the peaceful individuals from acts of hostility. There are circumstances,

however, when the first amendment right to assemble and demonstrate in a specific place or area must yield to the compelling interest of the community to maintain peace and order. In our opinion, against the background of what had already occurred and the potential danger of permitting the march to proceed, the order given was reasonable, and we hold that within the meaning of the ordinance it was a lawful order.

The record shows that the order prohibiting the marchers to proceed south of 18th Street was announced by a National Guard officer standing on a truck and using a bull horn. He announced, repeatedly, that the procession could go west or north but would not be permitted to go south. Approximately 10 minutes after the first announcement, Dick Gregory came out of the line of marchers and spoke with Deputy Superintendent Rochford. He told Rochford that the group wanted to march to the Amphitheatre, and Rochford replied that he was concerned that violence might erupt in the area into which they desired to march. Gregory stated that he wanted to take the group to his home for a meeting, and Rochford offered to escort any reasonable number of people to Gregory's home. Gregory rejoined the marchers and shortly thereafter returned and told Rochford they were going to march to the Amphitheatre. Rochford told him that if he crossed over 18th Street he would be arrested.

Defendant Neuhaus spoke with Rochford and told him he "represented a number of delegates" who wished to go to the Amphitheatre. Rochford told him no one would be permitted to walk through the line of Guardsmen but if he would call the delegates together transportation would be arranged to the convention.

Defendant Weiss, a delegate to the convention, testified that he joined the march and continued with it to the point where it was stopped. He stated that he advanced to the front of the marchers and at that point had a conversation with National Guard Colonel Donald G.

Lapsley, who told him "the line of march was to the west;" Weiss replied that he was a delegate on his way to the Amphitheatre and intended to go there. Lapsley told him that if he went south of 18th Street he would be arrested. He walked south and was arrested.

Defendant Kempton, also a delegate, joined the march near Grant Park and continued on to 18th and Michigan. He too was told that if he went south of the "line" he would be arrested. He walked through the line and was placed under arrest.

Defendant Weiss, in a separate brief contends that he was arrested "solely for the crime of walking in a southerly direction after being told not to do so; there was absolutely no showing of any imminent present threat of hostility caused by his lone act of walking to the south." He argues too, that prior to walking to the south he sought to avail himself of Deputy Superintendent Rochford's offer of transportation to the convention but was advised by Colonel Lapsley that the offer had been withdrawn. In rebuttal Rochford testified that only he had authority to withdraw the offer and had not done so.

Our review of the testimony leads us to conclude that the argument of defendant Weiss that when arrested he was in the act of walking to the convention alone, thus, in effect, completely disassociated from the other marchers, does not find support in the testimony. We conclude further that even assuming that when he sought to accept the previously extended offer of transportation to the Amphitheatre he was told it had been withdrawn, this fact did not give rise to a right to violate the lawful order not to proceed south on 18th Street. If reaching the Amphitheatre were in fact his intention, there were available means of achieving that goal without violating the police order.

Defendants argue that the order to stop the marchers at 18th Street was not given because of imminent danger of violence if the march proceeded, but was given in

furtherance of enforcing a "blanket prohibition against marches to the Amphitheatre." We have examined the portions of the record cited in support of this argument, and although there can be little doubt that the city did intend to prohibit demonstrations at the Amphitheatre, it does not follow that it intended to prohibit this particular march for any reason other than the one given by Rochford and the other police officials. It should be noted that the record presents no issue of the validity of the ban on demonstrations at the Amphitheatre. We are here concerned only with what occurred at 18th and Michigan, and having determined that the order not to proceed south of 18th Street was lawful, the sole remaining issue is whether, when defendants disobeyed the order, the other conditions requisite to sustain the judgment were present.

The record shows that immediately prior to and at the time when defendants crossed the "line" and were arrested, rocks and firecrackers were being thrown, more than three people were committing these acts in the immediate vicinity, and there is ample basis in the record to show that these acts would cause substantial harm. The testimony shows repeated announcement of the order, conversations between several of the defendants and various police officers, and obviously the defendants knew the order was that of a peace officer as required by the ordinance. There is no evidence that any of the defendants threw rocks or firecrackers or engaged in disorderly conduct, but it is not necessary for a conviction under section 193—1(d) to show that the defendant was one of the "three or more persons" committing acts of disorderly conduct. *City of Chicago v. Fort (1970), 46 Ill.2d 12; City of Chicago v. Greene (1970), 47 Ill.2d 30.*

Defendants, in their brief, point out alleged inconsistencies in the testimony of the police officers with respect to what they term the "female defendants." We have examined the testimony and it supports a finding that these defendants were within hearing range of the dispersal

order, unmistakably being given by a peace officer, and elected to cross the "line" knowing that it would result in their being arrested. We do not find the argument that no order of dispersal was given the "female defendants" persuasive.

Our examination of this record convinces us that the circumstances out of which these cases arose presented a situation where defendants' first amendment rights were required to yield to the compelling interest of the city to maintain peace and order. They elected to defy a lawful order and in so doing violated a valid ordinance. The judgments of the circuit court of Cook County are affirmed.

*Judgments affirmed.*

MR. JUSTICE SCHAEFER took no part in the consideration or decision of this case.