**DR. MARTIN LUTHER KING, JR. MOVEMENT, INC., et al., Plaintiffs,**

**v.**

**CITY OF CHICAGO, an Illinois Municipal Corporation, et al., Defendants,**

**The Southwest Parish and Neighborhood Federation, an Illinois Corporation, et al., Intervening Petitioners, as Defendants.**

**No. 76 C 2923.**

United States District Court, N. D. Illinois, E. D.

Sept. 13, 1976.

---

Edward T. Stein, Singer, Stein & Green, Val R. Klink, Klink & Moscovitch, David C. Thomas, Clarke,. Thomas & Piers, Synek, Bishart & Porikos, Chicago, Ill., for plaintiffs.

William R. Quinlan, Corp. Counsel, Richard J. Troy, Chicago Park Dist., Chicago, Ill., for defendants.

Memorandum

LEIGHTON, District Judge.

### I.

This is a suit by the Dr. Martin Luther King, Jr. Movement, Inc. and two individuals, against the City of Chicago, the Chicago Park District and certain officials of both municipal corporations. The relief sought are injunctive relief, declaratory judgment and damages to prevent, declare unconstitutional and compensate plaintiffs for alleged deprivations, by state officials, of rights to freedom of speech and assembly secured by the First and Fourteenth Amendments to the United States Constitution. Jurisdiction of this court is invoked

under 42 U.S.C. §§ 1981, 1983, 1985; the federal question jurisdictional provisions, 28 U.S.C. §§ 1331, 1343; the all writs section, 28 U.S.C. § 1651; and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202. The matter in controversy is alleged to exceed, exclusive of interests and costs, the sum of $10,000.

On motion, the court has allowed the Southwest Parish and Neighborhood Federation, an Illinois corporation, William Goetz and Gail Cichanowski, to intervene in these proceedings as defendants. The cause has come for hearing on plaintiffs' and intervenors' applications for a temporary restraining order, or in the alternative, for a preliminary injunction. From the testimony of witnesses and exhibits offered and received, the court finds that the following are the facts.

## II.

Plaintiff Dr. Martin Luther King, Jr. Movement, Inc., is a not-for-profit Illinois corporation whose purposes are to bring world peace and help all people enforce equal opportunities under God's will. It proclaims these purposes by the use of marches, rallies and assemblies in order to communicate with citizens, have them join in the effort to get open housing, end segregation in schools, obtain employment for all, but particularly for those who are black. The individual plaintiffs, Reverend Alexander I. Dunlap and Reverend Edgar Jackson, are, respectively, president, executive secretary and director of the corporate plaintiff.

Defendant City of Chicago is an Illinois municipal corporation. Under the state code, it has the power to regulate the use of city streets and public ways for marches and parades. Accordingly, it has adopted municipal code Section 36–31 which states that no parade, public assembly, or similar activity, shall be permitted on any Chicago street unless a permit is obtained from the Department of Streets and Sanitation. After detailing how such permits are obtained, the code provides that an application therefor must be filed at least seven days before the date of the proposed parade or public assembly. When this is done, the Commissioner of Streets and Sanitation shall investigate the facts and issue the permit. Two subsections of the code further provide that:

f. The Commissioner of Streets and Sanitation shall act upon the application for parade or public assembly permit within two (2) days after the filing thereof. If the Commissioner disapproves the application, he shall mail to the applicant within two (2) days after the date upon which the application was filed, a notice of his action, stating the facts and conclusions which are the basis for his denial of the permit. Any applicant who believes that his application is wrongfully disapproved may appeal to the Mayor the propriety of said action. Upon the filing of such appeal, the Mayor shall cause a hearing to be held and based upon the evidence contained in the record of such hearing, either affirm or reverse the decision of the Commissioner of Streets and Sanitation. The action of the Mayor shall be subject to Judicial Review in accordance with the provisions of the Administrative Review Act. In the event that the Commissioner fails to act within two (2) days after the date upon which the application was filed, said application for a permit shall be deemed approved and the permit deemed granted in conformance with the application.

g. The Commissioner of Streets and Sanitation in denying an application for a parade or public assembly permit, shall be empowered to authorize the conduct of a parade or public assembly on a date, at a time, at a location or over a route different from that named by the applicant. An applicant desiring to accept an alternate parade or public assembly permit shall, within two (2) days after notice of the action by the Commissioner of Streets and Sanitation, file a written notice of acceptance with the Commissioner of Streets and Sanitation. An alternate parade or public assembly permit shall conform to the requirements of and shall have the effect of a parade or public assembly permit.

In the city of Chicago, public parks are under the jurisdiction and control of defendant Chicago Park District. Anyone who desires to parade to and conduct an assembly in a park must obtain a parade permit from the city of Chicago for the use of its streets and public ways and a permit from the Chicago Park District to use the park. The District, as authorized by statute, has adopted rules and regulations governing applications for such permits. Generally, a form is obtained either at the park in question, or at the District's central office. Under Illinois law, use of a public park without a permit from the responsible park district is illegal.

There are a number of public parks in the city of Chicago. Among them are Ogden, Lindbloom, and Marquette Parks. Ogden and Lindbloom are in a section of Chicago that is surrounded by residences entirely occupied by persons who are of the Negro race. Marquette Park is in a section of Chicago surrounded by residences that are almost entirely occupied by persons of the Caucasian race. During recent years, a few Negro families have moved into residential areas near Marquette Park. During the same period, Negroes who have either driven their automobiles through areas near Marquette Park or who have moved or attempted to move into residences in that area, have been the objects of attacks by unknown persons armed with bombs, bricks and bats.

Beginning early in 1976, the plaintiff Dr. Martin Luther King Movement, through its officers and supported by its members, decided on a series of marches and assemblies to protest and demonstrate against the occurrences at or near Marquette Park. Acting through authorized representatives, it applied to the Department of Streets and Sanitation of the city of Chicago for a permit which would have allowed 250 persons to parade, march to and assemble in the park on June 26, 1976. The application was denied because it was " * * * the opinion of the Bureau of Street Traffic that the proposed event would inconvenience a large number of the traveling public. In addition, recent occurrences in the vicinity have precipitated a highly emotional condition in the area and would require the Police Department to supply a large amount of personnel to properly protect participants in the activity." Thereafter, plaintiffs made another application for a permit that would have allowed 250 persons to parade, march to and assemble in Marquette Park on Saturday, July 10, 1976. In response to this application, plaintiffs received a letter from the Department of Streets and Sanitation which, in part, told them:

Please be informed that you indicated an interim assembly area as Marquette Park. The Department of Streets and Sanitation does not have jurisdiction over these facilities and authorization must be received from the Chicago Park District.

In addition the movement of traffic in this area is critical on Saturdays and it is the opinion of the Bureau of Street Traffic that the proposed event would inconvenience a large number of the traveling public.

Finally, recent occurrences in the vicinity have precipitated a highly emotional condition in the area and would require the Police Department to supply a large amount of personnel to properly protect participants in the activity.

The Department of Police has informed us that they do not have the available manpower for this purpose.

In view of the above and in accordance with Section 36-31 of the Municipal Code of Chicago we must deny your request.

Plaintiffs then filed a suit in this court alleging infringement of their constitutional rights. When they moved for a temporary restraining order or, in the alternative, for a preliminary injunction, the case was continued. They took an appeal which resulted in an order directing that plaintiffs be given an immediate hearing. This was done; and Judge John F. Grady of this court issued an order that enjoined any interference by city or park officials with plaintiffs' march to and assembly in Marquette Park on July 17, 1976. The order

restricted the parade to a group of 250 persons.

On the designated day, and at the appointed time, a parade of some 225 to 275 persons proceeded on the march as authorized. At or near Marquette Park, sometime between 2 and 4 p. m. on July 17, 1976, bystanders, spectators and persons unknown began throwing rocks, bricks, pieces of concrete and explosive devices at the marchers. The plaintiff corporation, its members and supporters, the persons in the march, did not commit any act of violence nor provoke any disturbance. Thirty-one police officers were injured; private property along the march route was damaged; fifty-two adults and four juveniles were arrested. Because of the ensuing violence, the assembly in Marquette Park did not take place. Prosecutions of the persons arrested are now pending in the circuit court of Cook County.

Ten days after these incidents, plaintiffs applied for another permit, one authorizing a parade of 5000 people accompanied by 50 vehicles on August 21, 1976 to begin at 1 p. m. and proceed from 6430 South Ashland Avenue in Chicago south to 71st Street; west to Sacramento Boulevard and enter Marquette Park for prayer and picnic. Plaintiffs had not applied, nor did they at any time thereafter, apply for a permit from the Chicago Park District authorizing their use of Marquette Park on the day of the requested march. In fact, on July 16, 1976, park authorities issued a permit committing Marquette Park on August 21 and 22 for use by the Bicentennial Olympics Committee to a children's olympics involving between 3000 to 5000 boys, girls, adult men and women.

On July 30, 1976, the deputy commissioner of streets and sanitation wrote to plaintiffs telling them that their application for permission to conduct a parade to Marquette Park on August 21 had been received and that he was convening a meeting of the Parade Board at " * * * 10 a. m. Tuesday, August 3, 1976, for discussion of this requested event." The meeting was held, attended by plaintiffs through a representative; and during it, the deputy commissioner proposed an alternate route for the march, one which would have allowed the marchers to assemble at 6430 South Ashland, proceed north to 59th Street, west on 59th Street to Damen Avenue, and then to Lindbloom Park. This alternate route was proposed in accordance with provisions set forth in Section 36–31 of the Municipal Code of Chicago. In doing so, the deputy commissioner gave three reasons: (1) the size of the parade: 5000 people and 50 vehicles in contrast with previous applications for a parade and march of 250 persons; (2) the route the march was to take: West 71st Street, a four-lane public way, in a residential area, with only two for moving traffic; and (3) the fact that a previous parade in the proposed area had created problems for city authorities, including the police.

On the afternoon of the day the Parade Board met, plaintiffs' representative wrote to the deputy commissioner questioning the propriety of a Parade Board meeting and adequacy of the information on which the decision to propose the alternate route was made. The letter concluded with the statement that "[i]f it was meant for us either to approve or reject the alternate parade application which you submitted, then we reject it." The suit in this case was filed two days later; and plaintiffs have moved for issuance of a temporary restraining order, or, in the alternative, for a preliminary injunction praying that defendants be restrained from prohibiting the march of 5000 persons and 50 vehicles on the route plaintiffs proposed in their July 27, 1976 permit application. They ask that defendants be ordered to provide them adequate police protection to participants of the march; and for such other relief as this court may deem necessary, equitable and appropriate.

### III.

In support of their motion, plaintiffs have filed a memorandum in which they argue that the delay of the City of Chicago deputy commissioner of streets in acting on their application for the parade permit was a

denial without basis in fact or law; that they were frustrated by officials of the Chicago Park District in their attempts to obtain a permit to use Marquette Park on August 21, 1976, acts which resulted in unconstitutional deprivations of their rights; and that because of the injury they will suffer in the enjoyment of rights secured them by the First Amendment to the United States constitution, they are entitled to an order of this court granting them preliminary injunctive relief.

The city defendants have filed objections to plaintiffs' motion supported by a memorandum in which the park district defendants have joined arguing that the likelihood of ultimate success by the plaintiffs in this litigation is questionable; that granting them a temporary restraining order or preliminary injunction will substantially harm the general public; that plaintiffs will not be able to show irreparable injury from the facts and circumstances they have alleged; and that, in any event, they have not exhausted the remedies provided them under the city ordinance, provisions which in fact afford them an adequate remedy at law and thus preclude them from injunctive relief in this court.

The intervenor defendants have filed a memorandum in which as homeowners, residents and taxpayers of the Marquette Park area they argue that they have constitutionally protected rights to the enjoyment of their homes and residences without unlawful deprivation and damage; that as citizens living in the area into which plaintiffs seek by permit from defendants to march and parade, they have the right to be free from fear of violence, loss of property and inconvenience; and that they have no remedy at law and must appeal to this court's equitable jurisdiction. Consequently, they pray for a temporary restraining order or, in the alternative, for a preliminary injunction restraining defendants from issuing any permit which would allow plaintiffs to march or parade into the Marquette Park area at anytime.

Therefore, plaintiffs' motion, defendants' objections, and the motion of the intervenor defendants, present three issues. 1. Whether plaintiffs were wrongfully denied a permit by which they, in a peaceable and lawful manner, sought to exercise their First Amendment rights by marching and parading to Marquette Park in the city of Chicago on August 21, 1976. 2. Whether, even if plaintiffs were wrongfully denied a parade permit, should this court grant them preliminary injunctive relief when in fact they did not have a permit to enter Marquette Park, an area previously committed for use on the same day to a children's olympics committee. 3. Whether under the circumstances of this case the intervenor defendants are entitled to preliminary injunctive relief.

## IV.

### A. Plaintiffs' rights to the parade permit.

The evidence proves that on August 3, 1976 when the deputy commissioner proposed the alternate route for the one planned by the plaintiffs, his action was a denial of a permit application which had been filed seven days before on July 27, 1976. Section 36–31, subparagraph f, Chicago Municipal Code, provides that "[i]n the event the Commissioner of Streets and Sanitation fails to act within two (2) days after the date upon which the application was filed, said application for a permit shall be deemed approved and the permit deemed granted in conformance with the application." Obviously, this ordinance was disregarded in connection with plaintiffs' request for a permit. This disregard assumes significance when the route described in the application is compared with one proposed by the deputy commissioner.

Plaintiffs and their supporters had expressed the desire to proclaim in Marquette Park their protest against events which in their opinion had deprived Negro citizens of their constitutional rights. The audience they wanted for dissemination of their views was one composed of Caucasians, people who lived in the Marquette Park area. Plaintiffs wanted to call their dissatisfaction to the attention of those peo-

ple, solicit their support, and bring action from the public authorities. They had a constitutionally protected right to do this. *Baines v. City of Danville,* 337 F.2d 579 (4th Cir. 1964). And no one questions the fact that this purpose was legal and that plaintiffs were pursuing it in a lawful and peaceable manner.

The proposed alternate route was one by which plaintiffs had to proceed, not south on Ashland Avenue then west on 71st Street to Marquette Park where they believed there was an audience to which they could effectively express their views; it was north on Ashland to 59th Street and east to Lindbloom Park where the audience would be Negroes, people who needed no persuasion to the views plaintiffs had concerning events near Marquette Park. The alternate route, then was the suggestion of a forum that had the effect of depriving plaintiffs of their First Amendment rights. *Collin v. Chicago Park District,* 460 F.2d 746 (7th Cir. 1972).

In *Collin,* the court had before it the case of a Caucasian applicant for a permit to use Marquette Park because there, he and his followers could assert their right to free speech and assembly. Defendants, however, proposed four alternative forums "[t]wo * * * located in parks used almost exclusively by blacks, being Garfield and Washington, and a third, Burnham, although 'at one time predominately Negro, * * * ' " had become 50% white and 50% black. It was held that for park authorities to propose alternate forums to a Caucasian and his followers and shunt them to a black neighborhood where their views would find no reception was to deprive them of constitutional rights secured by the First Amendment to the United States Constitution. In the judgment of this court, the same deprivation was accomplished when the deputy commissioner proposed the route alternate to the one plaintiffs proposed to use when they applied for the permit.

Moreover, the alternate route was an ill-covered subterfuge. It utilized a constitutionally impermissible factor. Race, color, national origin, sex or religion, cannot be considered by those who exercise state regulatory powers. Compare *Wright v. State of Georgia,* 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963). Discrimination by a state or municipality against a person or group of persons because of race, color or condition, constitutes a denial of equal protection of the laws, and it is incumbent on the courts to inquire not only whether it has been denied in express terms, but also whether it has been denied in substance and in effect. See *Davis v. Schnell,* 81 F.Supp. 872 (S.D.Ala.1949), *affirmed* 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949); 16A C.J.S. Constitutional Law § 538 (1956). Plaintiffs' First Amendment rights could have been regulated in the public good. Compare *Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). However, they were entitled to have their permit application subjected to a uniformity of method, free from improper or inappropriate consideration, and free from unfair discrimination when it was considered by the deputy commissioner. *Cox v. State of New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); compare *Slate v. McFetridge,* 484 F.2d 1169 (7th Cir. 1973). It appears that he did not do this; in fact, he took into account another impermissible factor.

For example, he said that the alternate route was being suggested because " * * * a previous parade in the proposed area [along West 71st Street to Marquette Park] had created problems for city authorities, including the police." This was reference, no doubt, to the fact that on July 17, 1976, when plaintiffs and their supporters were proceeding peaceably and in a lawful manner on a march authorized by an injunctive order of this court, bystanders and spectators resorted to violence that damaged property, injured policemen, and resulted in 52 arrests. However, it is settled law that hostile spectators or bystanders do not justify the restraint of otherwise legal First Amendment activities. *Terminiello v. City of Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Gregory v. City of Chicago,* 394 U.S. 111, 89 S.Ct. 946, 22

L.Ed.2d 134 (1969). The threat of a hostile audience cannot be considered in determining whether a permit shall be granted or in ruling on a request for an injunction against a demonstration. *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 508 (1972); *Glasson v. City of Louisville,* 518 F.2d 899 (6th Cir. 1975); *Collin v. Chicago Park District,* 460 F.2d 746 (7th Cir. 1972); *Dunkel v. Elkins,* 325 F.Supp. 1235 (D.Md.1971); see also Annot., 5 A.L.R. Fed. 841 (1970). Thus, our laws bespeak what should be; for were it otherwise, enjoyment of constitutional rights by the peaceable and law-abiding would depend on the dictates of those willing to resort to violence. Unquestionably, the deputy commissioner was seeking to preserve public peace and prevent a conflict in the streets that had race undertones. But many years ago, the United States Supreme Court had occasion to say that "[d]esirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution." *Buchanan v. Warley,* 245 U.S. 60, 81, 38 S.Ct. 16, 20, 62 L.Ed. 149 (1917). It follows that if this laudable objective cannot be accomplished by laws and ordinances, it certainly cannot be achieved by ad hoc decisions of a municipal officer. Finally, as to the size of the parade, this court will judicially notice that 71st Street going west of Ashland Boulevard has the same characteristics as 59th Street going east. Therefore, it must be concluded that when, for the reasons given, the deputy commissioner proposed the alternate route, he wrongfully denied plaintiffs a parade permit by which they sought to exercise their First Amendment rights in a peaceable and lawful manner.

**B. Plaintiffs' rights to preliminary relief.**

In their motion for a temporary restraining order, or in the alternative for a preliminary injunction, plaintiffs had only one objective. They wanted this court to restrain defendants from prohibiting the parade to and assembly in Marquette Park on the afternoon of August 21, 1976 which plaintiffs described in their permit application of July 27. To accomplish this objective, plaintiffs prayed that the city defendants be compelled to provide them with adequate police protection; and that they be given such other equitable and appropriate relief as this court may deem necessary. They sought this relief, although they had never applied for nor obtained a permit which authorized them to use Marquette Park on the day in question.

Plaintiffs alleged that their efforts to obtain a park permit had been frustrated by park officials. Reverend Edgar Jackson, one of the plaintiffs, testified that sometime between July 27 and August 3, 1976, he telephoned the Marquette Park office and spoke to a woman who told him that an application form for a park permit had to be obtained from the superintendent personally. Reverend Jackson said that after talking to this woman, he concluded she was suggesting that he go to the park office so that unknown persons, perhaps those who had caused the violence of July 17, could attack and injure him. He admitted that the woman did not use words to this effect; it was, according to Reverend Jackson, the intonation of her voice that caused him to believe this. When asked why he did not get someone to accompany him to the park office, he said he did not think of that possibility. When asked why he did not seek police protection, he said he had no confidence in Chicago policemen.

One of plaintiffs' counsel testified that at or about August 3, 1976 he called the Marquette Park field office and talked to a Mrs. O'Brien who told him that the park was not issuing permits which would allow public assemblies during the balance of the summer. The lawyer said that he then called the main office of the District and talked to Mr. Edmund L. Kelley, the General Superintendent, who told him that permits for assemblies in Marquette Park were being issued. However, no application for one was made either by plaintiffs, or by anyone on their behalf.

At the hearing of plaintiffs' motion, a park district attorney represented in open

court that he called plaintiffs' counsel as soon as he heard of the planned parade in order to tell them that on July 16 the District had issued a permit which authorized the use of Marquette Park on August 21, 1976 for a children's olympics at which 3000 youngsters from throughout Chicago would attend with 2000 supervising adults. Evidently, this latter fact was unknown to the Chicago deputy commissioner of streets when he proposed the alternate route. In any event, this court is satisfied that park officials did not frustrate plaintiffs in their attempt to obtain a park permit; and that committal of the park for a children's olympics on August 21 was not a ploy. Planning for that event had begun late in the winter of 1976; flyers announcing the affair and describing the location had been printed early in the spring of this year. Therefore, 5000 people and 50 vehicles could not go to Marquette Park for a prayer and picnic on August 21 because third persons, none of them parties before this court, would be adversely affected.

 It is a rule of universal application in controversies of this kind that temporary injunctive relief should be granted only in cases demanding it, and the burden is on the applicant to show a clear right to this remedy. *United States v. Borden Company,* 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954); *Edwards v. Schmidt,* 321 F.Supp. 68 (W.D.Wis.1971). Generally, it is said that injunctive relief will be refused an applicant when the order will work a hardship on third persons who are not before the court. Compare *In Matter of Unterweser Reederei, GMBH,* 428 F.2d 888 (5th Cir. 1970); see *Middletown Manufacturing Co., Inc. v. Super Sagless Corp.,* 382 F.Supp. 979 (N.D.Miss.1974); 11 Wright & Miller, Federal Practice and Procedure, § 2942 (1973).

 Therefore, it appears that in this case plaintiffs have not shown a clear right to preliminary injunctive relief. They want this court to restrain defendants' prohibition of their planned parade to and assembly in Marquette Park on August 21, 1976. However, they do not have a permit to enter that public park. But what is more

important, an injunction issued by this court would adversely affect the rights of countless youngsters, none of them before this court. For these reasons, even though plaintiffs were wrongfully denied a parade permit by the city of Chicago, they will not be granted preliminary injunctive relief. Compare *Feinglass v. Reinecke,* 48 F.Supp. 438 (N.D.Ill.1942); see 43 C.J.S. Injunctions § 31 (1945).

**C. Intervenors' rights to preliminary injunctive relief.**

The Southwest Parish and Neighborhood Federation is a combined activity of seven community organizations that foster, encourage, and promote the physical and social improvement in the neighborhood serviced by each. These neighborhoods constitute an area in which reside more than 60,000 adults who are taxpayers and homeowners. The individual intervenors, William Goetz and Gail Cichanowski, reside in the area in which the federation operates; they are taxpayers and homeowners. The corporate and individual intervenors seek, in these proceedings, to represent a class consisting of all residents in the federation area who are taxpayers and homeowners, regardless of race, creed or ethnic origin. They oppose violence in any form, or under any guise; they are proponents of non-violence. Intervenors and the members of their class believe that violence is destructive; it damages and injures them, members of their class, and the reputation of the federation area. For these reasons, they oppose marches and parades where they live, because, as illustrated by the incidents of July 17, 1976, these result in violent clashes between marchers and spectators. And as a result, intervenors and those they represent are the victims; they are deprived of their right to use and enjoy the property they own. Therefore, they ask this court to issue either a temporary restraining order or a preliminary injunction restraining the city of Chicago and its officials from issuing any permit which would allow plaintiffs to parade to and assemble in Marquette Park area at any time.

In a memorandum filed in support of their motion, intervenors argue that their rights to be secure in the enjoyment of their homes are " * * * concomitant to the rights of free speech and assembly * * * " enjoyed by plaintiffs. They insist on equal entitlement to preliminary injunctive relief against official actions that infringe on their right to enjoy their property. They call this court's attention to the words of Mr. Justice Stewart in *Lynch v. Household Finance Corporation,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), "[t]he right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth a 'personal' right, whether the 'property' in question be a welfare check, a home, or a savings account. In fact, a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized." 405 U.S. 538 at 552, 92 S.Ct. 1113 at 1122, 31 L.Ed.2d 424. In addition, intervenors excerpt Mr. Justice Black's concurring opinion in *Gregory v. City of Chicago,* 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969), the Illinois Supreme Court opinion in *Chicago v. Weiss,* 51 Ill.2d 113, 281 N.E.2d 310 (1972), and rely on an expression from *Baines v. City of Danville,* 337 F.2d 579 (4th Cir. 1964), where in defining the limits to freedom of expression by demonstrators the court said that "[t]hose First Amendment rights incorporated into the Fourteenth Amendment, however, are not a license to trample upon the rights of others. They must be exercised responsibly and without depriving others of their rights, the enjoyment of which is equally as precious." 337 F.2d 579 at 586.

█ It cannot be doubted that these excerpts from the cases are expressions of fundamental constitutional principles. However, intervenors quote them out of context. The words of Mr. Justice Stewart from *Lynch v. Household Finance Corporation* were used to declare that a state's unlawful deprivation of a person's property is as much a violation of the Fourteenth Amendment as would be suppression of the right to speak or the right to travel. The words of Judge Haynsworth from *Baines v. City of Danville* were used to declare that as important as are First Amendment rights, those who seek to enjoy them cannot trample on the rights of others. In this case, the State of Illinois is not attempting an unlawful deprivation of intervenors' property or those of the class they seek to represent. It is not claimed that in the exercise of their First Amendment guarantees plaintiffs have committed any act that was unlawful, that disturbed the public peace, or trampled on the rights of others. Compare *Griffon v. Congress of Racial Equality,* 221 F.Supp. 899 (E.D.La.1963). And it is clear that the defendant officials of the City of Chicago had authority, indeed, the duty to enforce the law and honor plaintiffs' rights to engage in a peaceful expression of their views. Under these circumstances, they cannot be enjoined because to do so would disregard " * * * the important rule * * * that no injunction ought to issue against officers of a State clothed with authority to enforce the law in question, unless in a case reasonably free from doubt and when necessary to prevent great and irreparable injury." *Massachusetts State Grange v. Benton,* 272 U.S. 525, 47 S.Ct. 189, 71 L.Ed. 387 (1926); *Pearl Assur. Co. v. Harrington,* 38 F.Supp. 411 (D.Mass.1941). Therefore, intervenors have no right in this case to preliminary injunctive relief against the officials of the City of Chicago. See *Mims v. Yarborough,* 343 F.Supp. 1146 (D.S.C.1971).

V.

█ Having resolved the issues presented, resolutions which appear to have disposed of the controversy between the parties, it is necessary to determine whether events subsequent to the filing of the suit have affected the status of this case. The complaint, with 19 paragraphs describing the bases of federal jurisdiction, the parties, and the cause of action, is in four counts. The first two allege plaintiffs' filing of the permit application on July 27, 1976 by

which they sought authority to parade on August 27 from 6430 South Ashland Avenue in Chicago to West 71st Street and then to Marquette Park. It is alleged that although entitled to the permit, officials of the city, by action and inaction, denied plaintiffs their rights. The first two counts pray for a declaratory judgment and for preliminary and permanent injunctive relief. The last two incorporate the first and add allegations which are intended to support a claim for compensatory and punitive damages against defendants, jointly and severally, in favor of the corporate plaintiff and the two individuals. The substance of the complaint's four counts is the alleged violation of plaintiffs' rights with regard to the parade and the assembly in Marquette Park on the afternoon of August 21, 1976. That date has come and gone. And from this court's holding that neither plaintiffs nor the intervenors are entitled to preliminary injunctive relief, it appears that as the pleadings now stand, no claim can be established in this court. This cause, then, is moot.

Mootness is a jurisdictional question. *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). A court will not undertake to decide a question which by a change in the condition of affairs has become moot, even when this development occurs after commencement of the suit. *Lusk v. McDonough,* 386 F.Supp. 183 (E.D.Tenn.1974); 20 Am.Jur.2d Courts § 81 (1965). When an application for a temporary restraining order, or in the alternative a preliminary injunction, seeks to prevent an activity on a day certain, the suit becomes moot after passage of that day. *Fowler v. United States,* 258 F.Supp. 638 (C.D.Cal.1966). In such a case, because no relief within the scope of the complaint can be granted, the suit should be dismissed. *Todd v. Joint Apprenticeship Committee,* 332 F.2d 243 (7th Cir. 1964). That dismissal can be without prejudice to the filing of a supplemental complaint which may deal with any question, including a claim for damages. See *McKee & Company v. First National Bank of San Diego* (9 Cir. 1968), 397 F.2d 248. Accordingly, an order will be entered dismissing this suit as moot, without prejudice to plaintiffs' right to file a supplemental complaint within 30 days.

So ordered.